690 A.2d 612

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
SHAROB CLOWNEY, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 7, 1997—Decided March 19, 1997.

2

Before Judges MICHELS, MUIR, Jr. and COBURN.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Gilbert G. Miller*, Designated Counsel, on the brief).

Appellant, *Sharob Clowney*, filed a pro se supplemental brief.

*Edward M. Neafsey*, Assistant Attorney General, Acting Prosecutor of Union County, attorney for respondent (*David P. Schneider*, Special Deputy Attorney General/Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

MUIR, Jr., J.A.D.

On the evening of November 11, 1991, the police discovered the body of Barbara Williams (Williams) in her Elizabeth apartment. She had been repeatedly stabbed and had an electrical cord wrapped around her neck. Sitting in the bed near their naked mother's body were two of Williams' children—Kyshon, age five, and Karee, age nine. Both children had sustained multiple stab wounds estimated by a paramedic to have occurred 14 hours prior to their discovery. Defendant turned himself in to police the next day at the urging of some friends and associates to whom he had admitted stabbing the woman and her children.

A Union County Grand Jury indicted defendant for purposeful or knowing murder (*N.J.S.A.* 2C:11–3a(1), (2), count one); felony murder (*N.J.S.A.* 2C:11–3a, b, count two); burglary (*N.J.S.A.* 2C:18–2a, count three); aggravated sexual assault (*N.J.S.A.* 2C:14–2a(3), count four); attempted murder of the two children (*N.J.S.A.* 2C:11–3a(1), (2), counts five and six); possession of a weapon, a knife, for an unlawful purpose (*N.J.S.A.* 2C:39–4d, counts seven, eight, and nine); and possession of a weapon, the

same knife, under circumstances not manifestly appropriate for such lawful uses as it may have (*N.J.S.A.* 2C:39–5d, count ten).

A trial jury found defendant not guilty of burglary but guilty on the remaining charges. The trial court merged the appropriate counts and imposed the following sentences: on count one, life imprisonment with 30 years parole ineligibility; on count four, 9 years with 4 years parole ineligibility concurrent with count one; on count five, 20 years with 10 years parole ineligibility consecutive to count one; on count six, 20 years with 10 years parole ineligibility concurrent with count five and consecutive to count one. The court also imposed Violent Crimes Compensation Board (VCCB) penalties on counts one, four, five, and six. In the original judgment of conviction, the court imposed $30 VCCB penalties. In the amended judgment, it improperly increased those penalties to $35. As noted hereafter, we remand for correction. *See N.J.S.A.* 2C:43–3.1 (requiring a VCCB penalty of $30 be imposed for all crimes committed prior to December 23, 1991).

Defendant appeals from the October 16, 1994, amended judgment of conviction. A brief filed by counsel raises the following contentions:

POINT I

THE TRIAL COURT ERRED IN REFUSING TO ADMIT EVIDENCE OF MS. WILLIAMS'S ADMISSION THAT SHE WOULD EXCHANGE SEX FOR DRUGS.

POINT II

THE TRIAL COURT ERRONEOUSLY ADMITTED HEARSAY TESTIMONY AND UNFOUNDED EXPERT TESTIMONY AS EVIDENCE THAT DEFENDANT BROKE INTO MS. WILLIAMS'S APARTMENT THROUGH HER FIRE ESCAPE WINDOW (Partially Raised at Trial Level).

POINT III

THE TRIAL COURT'S ERRONEOUS RULINGS THAT PROFFERED TESTIMONY WAS HEARSAY DEPRIVED DEFENDANT OF A DEFENSE.

POINT IV

THE PROSECUTOR ON CROSS–EXAMINATION OF DR. COOKE ADDUCED INADMISSIBLE EXPERT TESTIMONY AS TO WHETHER DEFENDANT BORE THE CHARACTERISTICS OF A RAPIST.

POINT V

THE TRIAL COURT'S INSTRUCTIONS ON A NUMBER OF OFFENSES IN THE INDICTMENT WERE FATALLY DEFECTIVE.

A. *Passion/provocation manslaughter.*

B. *Imperfect Self-defense.*

C. *Felony murder.*

D. *Possession of a Weapon for an Unlawful Purpose.*

E. *Sexual Assault.*

F. *Diminished Capacity.*

POINT VI

DEFENDANT'S SENTENCE WAS MANIFESTLY EXCESSIVE.

Defendant's *pro se* brief argues:

POINT I THE STATUTE, *N.J.S.A.* 2C:4-2, DEFINING THE DEFENSE OF MENTAL DISEASE OR DEFECT, ON ITS FACE *AND AS* CHARGED TO THE JURY, SHIFTED THE BURDEN OF PROOF TO THE DEFENDANT IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW. (*U.S. CONST.* AMEND. XIV; *N.J. CONST.* (1947), ART. I, PAR. 1).

POINT II. THE JUDGE'S DEFINITION OF REASONABLE DOUBT DILUTED THE STATE'S BURDEN OF PROOF IN VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. *U.S. CONST.* AMEND. V, VI, XIV; *N.J. CONST.* (1947) ART. I, PARS. 1, 9, 10.

POINT III THE FAILURE OF THE COURT TO CHARGE "MISADVENTURE" OR ACCIDENT WAS ERROR. (Not Raised at Trial Level)

POINT IV THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE ADMISSION OF PHOTOGRAPHS THAT CREATED A SUBSTANTIAL DANGER OF UNDUE PREJUDICE. (Not Raised at Trial Level)

POINT V THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERROR VIOLATED THE COMMON LAW OF NEW JERSEY AND THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION. (Not Raised at Trial Level)

We affirm.

*I.*

The State presented evidence of a tragic criminal drama. In the very early morning hours on the day of the crime, an upstairs neighbor heard "unusual" sounds of a man's voice and a radio—like a party going on emanating from Williams' apartment. Around 7:30 a.m. she heard screaming, first by "kids" and then by "the lady." She also heard what sounded like rearranging of furniture.

Around nine or ten o'clock in the morning, Williams' oldest son, Kamil, returned to the apartment from a weekend with his father. Unable to gain entry, he sought the assistance of a neighbor, Patricia Andrews, a friend of his mother. Andrews and Kamil could not gain access even with a door key Williams had given Andrews.

During the same day, Mark Jones and Jefferson Feaster visited defendant, Feaster's cousin, at a hospital. Defendant had sustained puncture wounds to his right wrist and elbow and had been taken to the hospital by emergency medical technicians. Defendant told the EMTs he sustained his injuries when a mirror fell on his hand.

Defendant told Feaster and Jones a different story. When asked how he received his injuries, defendant responded, "he cut her." He also explained he "stabbed two kids" and their mother.

Jones, Feaster, and defendant left the hospital and went to the house where defendant lived with his mother. En route, defendant elaborated on his earlier statements. He stated he entered a woman's apartment through a window and was "tricking with her"—a slang expression to describe the exchange of sex for drugs or money. He stated he was "laying on the bed, he was like half asleep and he looked over and seen the female standing there with a knife and he spotted the two kids and he began to struggle with her for the knife." Defendant claimed he was cut in the struggle but thereafter blacked out. Defendant also told Feaster and Jones he stabbed the woman's two children.

Defendant then took Feaster and Jones to the Williams' fourth-floor apartment. Unable to raise a response from Williams' apartment, they spoke to a neighbor who referred them to the superintendent. The superintendent refused to let them into the apartment. The three then left the building.

Around nine or ten o'clock in the evening, Andrews contacted building security. The security personnel were off-duty police officers. When the police arrived and could raise no response to

their knocking, Andrews gave them the door key. They too could not gain access with the key and called police headquarters for assistance.

In the meanwhile, Andrews, on her own, went out on a joint fire escape between apartments. She found the window to the Williams' apartment slightly ajar. She opened the window, entered, and immediately began screaming at the sight of blood on the floor.

Hearing the screams, one police officer, Sergeant Torner, came to the fire escape and entered the apartment through the window while another, Officer Colon, simultaneously gained access when the fire department opened the hallway door. Sergeant Torner found Williams' body. Officer Colon found the two children covered with stab wounds and dry blood with "meat or whatever hanging out." Colon testified, "they were very nervous. They looked like they were in shock." Colon summoned on the scene emergency medical technicians.

James Kelly, one of the technicians, administered first aid to Karee. Karee had 25 stab wounds to his arms, legs, chest, and back. Some wounds penetrated his chest and collapsed his right lung. Based on the state of the wounds, particularly the dried blood, Kelly estimated the attack occurred some 14 hours before.

Karee was generally silent. He spoke only when questioned by Kelly. He responded very slowly to questions. Kelly noted that, despite the presence of 15 to 18 others in the room, Karee acted as if no one else was there. Kelly described the boy as in a daze.

When asked what had happened, Karee explained a man came in through the window and stabbed him, his brother, and his mother. He stated he avoided being killed by playing dead.

Kyshon Williams sustained 37 stab wounds. They were to his face, neck, chest, stomach, back, arms, and legs. Absent medical attention, both children would have died.

Police found evidence of forced entry. The fire escape window to the apartment contained pry marks. They also found a window

screen next to the deceased. However, due to her excitement, Andrews could not recall whether she took off the screen, something she originally said, or whether it was off when she entered the apartment.

A t-shirt stained with defendant's semen was recovered from the apartment. The shirt also contained Kyshon's blood. Trousers taken from defendant contained Williams' blood. A knife found in the apartment also contained Williams' blood.

Williams died due to loss of blood at least twelve hours prior to the discovery. Karee's testimony reflected his mother survived for some time after the attack. The boy testified that after defendant left the apartment he covered his naked mother with a blanket and as he did she told him "she loved him."

The contusions and hematomas about Williams' face and arms were consistent with being punched or held. She had a lip laceration consistent with being punched. Her jugular vein was cut. She had a stab wound that went through her chest and lung into her back. She suffered a knife wound to her upper abdomen that went through her diaphragm and liver ending in her back. The pathologist found defensive wounds on the body.

An autopsy revealed Williams' vagina was unusually dilated, indicating sexual activity before death. Her anus was also dilated and contained a small fresh tear. The pathologist testified the tear was evidence of some forceful sexual activity. None of defendant's semen was found in the victim's body cavities.

The day after the discovery of the crimes, defendant turned himself in to the police in Elizabeth. He did so only after urging by Feaster and Jones. While in custody, defendant waived his *Miranda* rights and told the police he sustained his injuries when attacked by a lady with a knife as he lay in the woman's bed. He then requested an attorney and the interview ended.

Kyshon and Karee identified defendant in a photo array. Kyshon reported seeing defendant on past occasions behind their apartment building but never in the apartment on any prior

occasion. There is some testimony by a psychiatrist, who examined the boy during his hospitalization, that the boy said he had seen the man who killed his mother in the "house" prior to the attacks. But, it is not clear whether the "house" reference is to the apartment building or to the Williams' apartment. Kyshon testified defendant came through the window and murdered his mother. He also corroborated his brother's testimony that he pretended to be dead after the attack. Kyshon locked the door after the defendant left. The boys did not respond to subsequent knocking at the door for fear defendant had returned.

Defendant did not testify nor did he offer any evidence to deny commission of the homicide and assaults. Instead, he presented the testimony of Dr. Gerald Cooke, a State of Pennsylvania state hospital psychologist, to support his claim of diminished capacity. *See generally State v. Reyes,* 140 *N.J.* 344, 658 *A.*2d 1218 (1995); *State v. Moore,* 122 *N.J.* 420, 431, 585 *A.*2d 864 (1991); *State v. Oglesby,* 122 *N.J.* 522, 528, 585 *A.*2d 916 (1991).

Dr. Cooke gave an uninterrupted, detailed litany of defendant's version of the circumstances surrounding the crime. This litany was prefaced with defendant's representation that he had not used alcohol or drugs the day before the crime and that he was "very emotionally distraught, more angry and upset than usual." The psychologist went on to describe that defendant left the house "looking for a friend"; that he met Williams "on the elevator in her building"; and that, although not sure whether Williams asked him to come to the apartment, he entered the apartment through "the door." The psychologist was careful to note defendant refuted the children's claim that he went in through a window. The psychologist further related that defendant said he "wasn't interested in sex, he just wanted someone to talk to, but he did give her the money and they had a sexual relationship" in any event. In response to a later question by counsel about whether defendant said anything about knowing Williams "vis-a-vis drugs," the psychologist reported defendant told him he knew Williams because she was one of his illicit drug customers.

Defendant said Williams, after the sexual encounter, asked him to stay with the children while she left. Upset by a recollection of his mother's leaving him alone, defendant refused and left the apartment. However, he returned to the apartment shortly thereafter to avoid possible problems with police he saw on the street when he emerged from the apartment. The psychologist, in response to defense counsel's question, reiterated that defendant claimed he went through the door both times he entered the apartment and not through the window. Upon his return, defendant claimed Williams began to annoy and aggravate him when she tried to "entice him into a sexual situation" after he rejected her advances.

The psychologist's litany continued:

And the last thing he says he remembers was lying there on the bed while she was doing these things and saying these things with the knowledge that her two children were in the next room while she was trying to have sex with him. And he says he related this back and wondered if the same thing had happened, believed the same thing had happened when he was a child and in that room and his mother was with a stranger in the next room having sex. And he says that's the last thing he remembers until the next morning.

He says the next thing he remembers that he was on the street near the high school on the morning of November 11th, '91. He says he then blacked out again and he's not sure exactly what the next thing was that he remembers. He says either he was in a 7–11 calling his cousin or he was back at his own house, but he's not sure.

He says that from the time he came out of that blackout he had a feeling that something had happened to her and to the children. He says it was more a feeling than a memory. And he says he was afraid and thought that he might have hurt her. He says he also reasoned that if he had not hurt the children, then the children would have reported that he hurt her and people would be looking for him, but they weren't. So he also reasoned and thought that he might have hurt the children. As I say, this was a feeling rather than an actual memory.

The litany served the purpose of refuting evidence in the State's case while avoiding cross-examination. The litany was directed, in part, at undermining the children's contentions defendant came through the window. At the same time, to counter the rape charge, it presented a picture of Williams' voluntary solicitation of the sexual encounter while characterizing her as a drug-using seducer. It failed, however, to explain how defendant could have

told his cousin and Jones he knifed the children and their mother if he had blacked out before those events. It also failed to countervail the State's case in other respects.

The blackout became the key to the psychologist's opinion defendant was unable to act in a knowing and purposeful fashion when he killed the victim and knifed the children. The psychologist diagnosed defendant as having a borderline personality disorder with overtones of alcohol abuse and depression, a depression that was in remission. He opined the disorder causes defendant to lose control of himself when in a rage, fatigued, or under the influence of alcohol or drugs. He described that loss of control as a "dissociative state" that involves a blackout. During the blackout in question, the doctor testified, "[h]e didn't think, he acted." Consequently, the doctor reasoned during the blackout defendant "was unable to act in a knowing or purposeful fashion."

The prosecutor conducted a very comprehensive cross-examination. He explored, in depth, the expert's conclusion defendant "was unable to act in a knowing or purposeful fashion" at the time of the crimes. In the course of the cross-examination, the prosecutor established there was no medical or other documentation that defendant suffered from blackouts in the past.

The jury found defendant guilty of all but the burglary charge, and the trial court sentenced defendant to the aggregate term of life with 20 years and 40 years parole ineligibility. Defendant appeals the ensuing judgment of conviction.

## II.

■ Defendant argues the trial court erred when it refused to allow testimony by an acquaintance of Williams that Williams stated she provided sex to men in exchange for money to buy drugs. He argues the evidence was crucial to defend the rape charge by substantiating defendant's claim that he was an invited guest in Williams' apartment. He further contends, since the

victim is deceased, the rape shield statute did not bar the offered testimony. We find no error in the trial court's ruling.

In relevant part, *N.J.S.A.* 2C:14-7 provides:

a. In prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, endangering the welfare of a child in violation of N.J.S. 2C:24-4 or the fourth degree crime of lewdness in violation of subsection b. of N.J.S. 2C:14-4, evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except as provided in this section. When the defendant seeks to admit such evidence for any purpose, the defendant must apply for an order of the court before the trial or preliminary hearing, except that the court may allow the motion to be made during trial if the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence. After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material and meets the requirements of subsections c. and d. of this section and that the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies the standards contained in this section. The defendant may then offer evidence under the order of the court.

. . . .

c. Evidence of previous sexual conduct with persons other than the defendant which is offered by any lay or expert witness shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease.

d. Evidence of the victim's previous sexual conduct with the defendant shall be considered relevant if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively permitted the sexual behavior complained of.

In *State v. Budis*, 125 *N.J.* 519, 593 *A.2d* 784 (1991), the Court explained the predicates for rape shield statutes.

In response to problems surrounding the reporting and prosecution of sexual assault cases, legislatures throughout the United Stated, including New Jersey, have enacted rape shield laws. Those laws represent a legislative response to the common law rule permitting cross-examination of a rape victim about her prior sexual conduct. Such conduct was traditionally considered evidence of the victim's inclination to consent to sexual intercourse and of her lack of moral character and credibility. Because of the "character assassination" of the victim, rape trials sometimes degenerated to embarrassing invasions of the victim's privacy.

One of the primary purposes of the statutes is to protect rape victims from excessive cross-examination, thereby encouraging them to report the abuse. The

statutes also guard against the improper use of evidence of the victim's prior sexual experience. Thus, in addition to protecting victims of sexual assault, rape-shield statutes preserve the integrity of trials. By ensuring that juries will not base their verdicts on prejudice against the victim, the statutes enhance the reliability of the criminal justice system.

[*Id.* at 528–29, 593 *A.*2d 784 (citations omitted).]

The rape shield law's applicability here is prefatorily challenged on grounds Williams' death makes it inapplicable. We find nothing in the language of the statute, or its underlying purposes, to suggest a deceased victim's prior sexual conduct is less protected than a living victim's.

Beyond that, we find it irrational and illogical to suggest that the rape shield law should be made inapplicable when the victim is killed after a rape. The statutory goals of protecting the privacy of the victim and seeking to avoid character assassination are no less consequential when the rape victim is killed. A deceased rape victim's life is entitled to the same privacy as a surviving victim's. We, accordingly, reject defendant's argument that the rape shield law was inapplicable due to the fact the victim is deceased.

While this state has no reported cases on the issue, a limited number of decisions from other jurisdictions have reached the same conclusion. In *Jenkins v. State,* 627 *N.E.*2d 789 (Ind.1993), *cert. denied,* 513 *U.S.* 812, 115 *S.Ct.* 64, 130 *L.Ed.*2d 21 (1994), the Indiana Supreme Court explained their rape shield law's applicability despite the victim's death.

The [rape shield] statute makes no exception if the victim is deceased. Appellant is correct that one of the purposes of the statute is to protect living victims and their families from the embarrassment of public discussion of the victim's prior sexual activity. The goal is to promote the reporting of the crime. If the statute is not applied to victims who ultimately are murdered, then perpetrators of sex crimes will be encouraged to kill their victims, thus enabling them to defend the charges through the exploitation of evidence of the victim's prior sexual activity.

[*Id.* at 795.]

*See also Mitchell v. State,* 884 *P.*2d 1186, 1199 (Okla.Crim.App. 1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 95, 133 *L.Ed.*2d 50 (1995); *Holland v. State,* 587 *So.*2d 848, 863 (Miss.1991); *compare State v. Sexton,* 336 *N.C.* 321, 444 *S.E.*2d 879 (victim's death

abrogated the statute but limited ruling to facts of case), *cert. denied*, —— *U.S.* ——, 115 *S.Ct.* 525, 130 *L.Ed.*2d 429 (1994).

A more consequential issue, however, is whether the statute's application denied defendant a defense to the rape charge. *See Budis, supra*, 125 *N.J.* at 530, 593 *A.*2d 784. That issue requires a review as to whether the evidence was relevant and highly material to the defense and whether its probative value outweighs its prejudicial effect. *Id.* at 532, 593 *A.*2d 784. "The proper balance of relevance and prejudicial effect depends on the facts of each case." *Id.* at 533, 593 *A.*2d 784. Where the probative value of the prior conduct outweighs the prejudice, "the evidence may not constitutionally be excluded." *Id.* at 532, 593 *A.*2d 784. However, "[t]he probative value of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." *Id.* at 533, 593 *A.*2d 784.

Applying these criteria, we are satisfied the trial court properly excluded the proffered evidence after conducting a preliminary hearing. During the hearing, defense counsel sought admissibility of the acquaintance's statement that Williams "told me she would go out with men and have sex with them for money so that she can buy her drugs." The acquaintance admitted, however, she did not know if Williams brought men to her apartment. Defense counsel argued the statements had relevance to explain why defendant was in the victim's apartment. He contended without it defendant would be prejudiced because the jury would not know he was there for consensual sex and that lack of knowledge would create sinister inferences and implications. The trial court rejected the reasoning. We find no error in that rejection.

Defendant maintains a similar claim of prejudice on appeal. He contends the evidence supporting his reason for being in the apartment was scant. To counter that scantness, he essentially asserts the excluded evidence was necessary not only to demonstrate that he was in the apartment with Williams' consent and not

only to countervail the children's claim defendant came in through the window off the fire escape, but also to rebut the charge of rape. There is no suggestion the evidence had the relevance designated in *N.J.S.A.* 2C:14–7c or d.

Defendant's contentions demonstrate fatal weakness when Dr. Cooke's litany of defendant's version of the events is considered. The psychologist's explications counter the scantness of proof argument. The extensive unchallenged litany made the jury totally aware of defendant's claim of a consensual sexual encounter with Williams. It removed, if accepted by the jury, the sinister inferences and implications defendant finds so noteworthy. The excluded statement, however, had none of the relevance identified by the statute. It did not constitute proof of the source of semen, pregnancy, or disease. It also had no consequence on prior sexual relations between Williams and defendant because defendant claimed no prior sexual relationship with Williams. It also lacked probative value to support a contention, obviously sought by defendant, that Williams' "sex for cash" penchant extended to her personal living quarters because the acquaintance could not say Williams conducted her alleged prostitution in her apartment where her children would be present.

On the other hand, the clear import of defendant's proffer countervailed the rape shield law's purpose. In its denigration of Williams' reputation, it sought to draw the inference from the alleged prior sexual activity that no rape occurred. Defendant's proffer was undergirded by the clear inference that because Williams allegedly had consensual sex for money with others she had consensual sex with defendant the day of her death. That clear import would vitiate the shield of the statute. *See Jeffries v. Nix,* 912 *F.*2d 982, 987 (8th Cir.1990) (evidence that victim exchanged sex for money on previous occasions could not support claim victim did so on this occasion), *cert. denied,* 499 *U.S.* 927, 111 *S.Ct.* 1327, 113 *L.Ed.*2d 259 (1991). Under the facts of this case, we are satisfied the proper balance between probative value and

prejudicial effect dictated exclusion of the acquaintance's statement.

### III.

Defendant further contends that the prosecutor's cross-examination of Dr. Cooke elicited impermissible testimony on whether defendant possessed the characteristics of a rapist. Defense counsel did not object to the alleged errant cross-examination at the time it was conducted but the next day sought a mistrial. The trial court concluded the cross-examination appropriately bore upon the expert's conclusion regarding defendant's ability to have a knowing and purposeful state of mind and refused to grant a mistrial. We find no error in the trial court's ruling.

The prosecutor very carefully, and at great length, explored the basis for Dr. Cooke's diagnosis and his conclusion defendant's blackout prevented him from having the required purposeful and knowing state of mind at the time of the crimes. In that exploration, the prosecutor reviewed with Dr. Cooke defendant's school records evidencing defendant's manipulativeness and his "power complex" as part of his need "to be a man" and how he used violence to satisfy that complex—violence that occurred with no blackouts. The prosecutor quoted school records indicating defendant "spoke of purposely acting disruptive to prove his manhood." He got the expert to agree that as part of defendant's expression of rage, and in the absence of blackouts, defendant carried out violent acts consonant with a manipulatively conceived goal.

In that setting, the following colloquy occurred:

Q Doctor, you indicated that you were on the staff of or consulting with some state prison?

A I have been a consultant to two of the state prisons in Pennsylvania as well as other, you know, places.

Q So crime is kind of part of the work you get involved in on a fairly regular basis?

A Yes.

Q You would agree with me that the crime of rape is a crime of power or control, would you not?

A At least as much or more so than it is a crime of sex, yes.

Q And so when there is this finding that [defendant] is the type of person who wants power and control, you would find that consistent with that of a person who would ultimately become a rapist?

A Well, it's not that much of a one-to-one relationship. I would put this way—

Q Would you say that that's one of the factors? That's certainly consistent with becoming a rapist, someone who wants the power and control?

A Yes, I would say his personality is certainly not inconsistent with that kind of crime.

Shortly thereafter, in the same context, the colloquy went on.

Q Now, again, we have that word or that theme of manhood. When you put that together with this idea of sexual—lack of sexual identify, manhood, manipulation, power and control, you get this theme, as you would call it, do you know, of the picture of someone who is totally consistent, someone who's going to grow up to be a rapist?

A It could be consistent. There are many people like that who are not rapists and there are rapists who certainly don't fit that picture. That is why I talked about it in terms of consistencies. It certainly could be consistent, yes. I've evaluated, many rapists who have that personality makeup.

Q And it wouldn't surprise you, if you assume that [defendant] was a rapist? Just assume that for the moment. You wouldn't look at that history and say, geez, it just doesn't jibe?

A No, it fits.

Defendant claims his convictions must be reversed because the testimony elicited lacked the scientific reliability foundation required for admissibility of a psychological profile of a rapist. *See State v. Cavallo*, 88 *N.J.* 508, 443 *A.*2d 1020 (1982). We reject that contention because the evidence was not offered for establishing a profile but rather addressed, as part of proper cross-examination, the expert's opinion that defendant did not have the required mental state of mind.

Cross-examination has long been a vital feature of Anglo–American jurisprudence. Its vitality is predicated on the belief that no safeguard for "testing the value of human statements is comparable to that furnished by cross-examination." 5 *Wigmore on Evidence* § 1367 (Chadbourn rev. 1974). Cross-examination is "the 'greatest legal engine ever invented for the discovery of truth.'" *State v. Silva*, 131 *N.J.* 438, 444, 621 *A.*2d 17 (1993) (quoting *California v. Green*, 399 *U.S.* 149, 158, 90 *S.Ct.* 1930,

1935, 26 *L.Ed.*2d 489, 497 (1970) (quoting 5 *Wigmore on Evidence* § 1367, at 32 (Chadbourn rev.1974))). The testing of human statements takes on a heightened consequence when an expert's testimony is involved.

 Testimony by experts is authorized where scientific or specialized knowledge will assist the trier of fact to determine a fact in issue. *N.J.R.E.* 702. It must deal with a subject that is beyond the understanding of the ordinary layman. *State v. Odom*, 116 *N.J.* 65, 71, 560 *A.*2d 1198 (1989). "The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment" as to a fact in issue. *Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982). Thus, by its very premise for admissibility, its esoteric, abstruse, and especial nature, expert testimony and opinion are subjects for legitimately expansive cross-examination if a jury is to be enabled to assess their soundness. This is particularly justified where, as here, the expert opinion is an evaluation of a defendant's mental capacity as of a particular moment in the past. Psychology, like its allied medical discipline psychiatry, is not an exact science. *See, e.g., Schueler v. Strelinger*, 43 *N.J.* 330, 204 *A.*2d 577 (1964).

Except for felony murder, the State had the burden of proving defendant acted purposely or knowingly. The expert's testimony sought to undermine the State's ability to prove those culpability elements. The prosecutor probed the soundness of that effort through cross-examination.

The constant focus of the prosecutor's probing, including the alleged improper cross-examination, was Dr. Cooke's opinion of defendant's capacity to act knowingly or purposely and how the generalized psychological traits of borderline personality with dissociative overtones related to that opinion. It dealt with the expert's identification of defendant's impulsiveness, rage, depression, or personality disorder to ascertain their relevance to defendant's ability to form the required mental state. *See, e.g., State v. Russo*, 243 *N.J.Super.* 383, 393–96, 579 *A.*2d 834 (App.Div.1990),

*certif. denied,* 126 *N.J.* 322, 598 *A.*2d 882 (1991). With its concentration on defendant's capacity to have the required state of mind, the objected-to portion of the cross-examination bore directly on that state of mind. Its design was not to establish defendant's profile as a rapist.

The challenged cross-examination also had relevance to matters addressed on direct and the psychologist's credibility. By precisely relating defendant's version of the crime, including its countervailing of the children's statements, and by accepting defendant's blackout claim, the psychologist impliedly, if not expressly, endorsed the truthfulness of defendant's representations. That endorsement necessarily extended to the claim of a voluntary sexual encounter with Williams. The objected-to cross-examination explored that claim. It also dealt with the psychologist's credibility in accepting defendant's representations. It is beyond dispute that matters addressed on direct as well as witness credibility are proper subjects of cross-examination.

Moreover, the objected-to portion of the cross-examination represented a very small, isolated portion of the cross-examination. That inconsequence also undermines the reversible error contention.

Accordingly, we are satisfied the trial court did not abuse its discretion by permitting the State's cross-examination to pose the questions challenged. Additionally, we are satisfied from our review of the entire record that the trial court's denial of the mistrial motion did not create a manifest denial of justice. *See State v. Johnson,* 203 *N.J.Super.* 127, 495 *A.*2d 1367 (App.Div.), *certif. denied,* 102 *N.J.* 312, 508 *A.*2d 195 (1985).

## IV.

We find all the remaining contentions alleging error during trial to be without merit. *R.* 2:11-3(e)(2). Moreover, even assuming that some error occurred, the errors were harmless beyond a reasonable doubt. They were not "clearly capable of producing an unjust result." *R.* 2:10-2; *State v. Lair,* 62 *N.J.* 388, 392, 301

*A.*2d 748 (1973). The overwhelming evidence of defendant's guilt demonstrates that, even if error did occur, it did not have the magnitude that could have "led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971). We also find without merit defendant's challenge to the constitutionality of *N.J.S.A.* 2C:4–2. *R.* 2:11–3(e)(2).

## V.

■ Finally, we are satisfied the sentence imposed was neither illegal nor excessive. A careful review of the record shows the sentence complies with the Criminal Code as explicated by case law. The trial court properly conducted the balancing of aggravating and mitigating factors in sentencing defendant for crimes that demonstrated not only significant cruelty, *see State v. O'Donnell,* 117 *N.J.* 210, 217–18, 564 *A.*2d 1202 (1989), and attacks on very young, vulnerable children, *id.* at 218–19, 564 *A.*2d 1202, but also displayed attempts to kill those children in an effort to cover up the murder of their mother.

We are satisfied the sentence is neither manifestly excessive nor unduly punitive and does not represent a miscarriage of justice or shock the judicial conscience. *Id.* at 215–16, 564 *A.*2d 1202; *State v. Jarbath,* 114 *N.J.* 394, 401, 555 *A.*2d 559 (1989); *State v. Ghertler,* 114 *N.J.* 383, 387–88, 393–94, 555 *A.*2d 553 (1989); *State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984).

## VI.

Accordingly, the judgment of conviction and order for commitment are affirmed, except as to the VCCB penalties as noted. The matter is remanded for correction of the judgment of conviction.