697 A.2d 550

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. AZEM CUNI, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 20, 1997—Decided July 18, 1997.

Pressler, P.J.A.D., filed dissenting opinion.

586

Before Judges PRESSLER, STERN and HUMPHREYS.

*J. Michael Blake,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney; *Mr. Blake,* of counsel and on the brief).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Ms. Foddai,* of counsel and on the brief).

The opinion of the court was delivered by

HUMPHREYS, J.A.D.

The defendant was convicted by a jury of first degree aggravated sexual assault on T.O., contrary to *N.J.S.A.* 2C:14–2(a)(3) (count one); second degree sexual assault on T.O., contrary to *N.J.S.A.* 2C:14–2(c)(1) and (2) (counts two and three); third degree burglary, contrary to *N.J.S.A.* 2C:18–2 (count four) and fourth degree criminal trespass, contrary to *N.J.S.A.* 2C:18–3 (count five). At sentencing, the judge merged counts two and four into count one. Defendant was sentenced on count one to twelve years in prison, on count three, to a concurrent six year term and on count five to a concurrent six month term. A Violent Crimes

Compensation Board penalty of $150 was imposed. Defendant appeals. He contends:

I. THE DEFENDANT'S RIGHTS OF CROSS-EXAMINATION AND CONFRONTATION AND HIS RIGHTS TO PRESENT A DEFENSE AND TO A FAIR TRIAL WERE VIOLATED BY THE EXCLUSION OF RELEVANT EVIDENCE AND THE RESTRICTION OF CROSS-EXAMINATION ON RELEVANT MATTERS.

II. DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND WAS CLEARLY PREJUDICED BY HIS TRIAL COUNSEL'S FAILURE TO COMPLY WITH THE RAPE SHIELD LAW AND BY HIS DECISION TO PRESENT EXPERT TESTIMONY WHICH INDICATED THAT THE DEFENDANT WAS GUILTY OF FORCIBLE RAPE. (Not Raised Below).

III. THE COURT'S INCORRECT EXPLANATION OF THE ELEMENT OF MENTAL DEFECTIVENESS ALONG WITH THE COURT'S *VOIR DIRE* QUESTIONS AND THE PROSECUTOR'S OPENING ALLOWED THE JURY TO CONVICT DEFENDANT UNDER A STANDARD OF MENTAL DEFECTIVENESS MUCH LESS STRENUOUS THAN THAT INTENDED BY THE LEGISLATURE. (Partially Raised Below).

IV. THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY TO SCRUTINIZE THE CIRCUMSTANCES OF THE DEFENDANT'S ALLEGED ORAL STATEMENTS TO THE POLICE DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not Raised Below).

V. THE TRIAL COURT'S FAILURE TO DEFINE COERCION AS AN ELEMENT OF THE AGGRAVATED SEXUAL ASSAULT ALLEGED IN COUNT TWO DENIED DEFENDANT A FAIR TRIAL AND DUE PROCESS OF LAW.

VI. DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BECAUSE THE COURT FAILED TO CHARGE SEXUAL CONTACT AS A LESSER-INCLUDED OFFENSE.

VII. DEFENDANT'S CONVICTION UNDER COUNT ONE MUST BE REVERSED DUE TO THE INADEQUATE INSTRUCTION ON AGGRAVATED SEXUAL ASSAULT.

VIII. DUE TO THE COURT'S INADEQUATE CHARGE ON CRIMINAL TRESPASS AS A LESSER-INCLUDED OFFENSE, DEFENDANT['S] CONVICTION FOR BURGLARY MUST BE REVERSED. (Not Raised Below).

IX. PREJUDICIAL PROSECUTORIAL MISCONDUCT DURING SUMMATION DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. (Not Raised Below).

We have thoroughly examined the record and considered the arguments presented. The conviction for the crime in count one, aggravated sexual assault, was based on sexual penetration of T.O.

during a burglary. The burglary consisted only of an unauthorized entry into T.O.'s home with a purpose to commit a sexual assault. Under these circumstances, in order for the defendant to be convicted of the first degree crime of aggravated sexual assault, the State must prove beyond a reasonable doubt the requisite elements of the crime of sexual assault. The jury was not so charged. This omission was clearly capable of causing an unjust result. *See R.* 2:10–2. Hence, the conviction in count one for aggravated sexual assault must be reversed. For substantially the same reason, the burglary conviction in count four must also be reversed. We affirm the convictions on counts two, three and five.

## I

### FACTS

T.O. is mentally handicapped due to Down's Syndrome. She was classified in 1981 by a child study team as "educable mentally retarded" with an IQ of 70. She was formally educated in public schools until she was twenty-one years old. Afterwards, she lived at home with her mother. She has been employed in various jobs. She is approximately four feet nine inches tall, tends to be overweight and has flat facial features. Her fingers are somewhat stubby and her speech is child-like.

The defendant is an emigre from Albania. He attended school in Albania until the eighth grade. According to a post-conviction report from the Adult Diagnostic and Treatment Center ("ADTC"), the defendant's mental ability is uncertain. As set forth in the report: "[g]iven that English is not Mr. Cuni's first language, there was no way to obtain an accurate estimate of his level of intellectual functioning." Tests given at ADTC placed him in the "mentally deficient" classification, but according to the ADTC report, "[b]ased upon clinical impression, this seems to be an underestimate of his true intellectual potential." Additionally, the report indicates there is "some possibility of underlying neurological impairment."

The evidence at trial can be summarized as follows. In October 1992, T.O. telephoned a local restaurant to order a sandwich to be delivered to her home. The defendant was a delivery man for the restaurant. He arrived with the sandwich and knocked on the door. The door had a lock to which only T.O.'s mother had a key. T.O. opened the window near the door. T.O. testified that when she opened the window, the defendant kissed her on the lips, which she did not want. He told her there was "talk" in the restaurant about her and that they said she was a beautiful person.

The defendant testified that when she opened the window, he told her that she was "nice" and "good looking." She responded, "yes, I am you know." The defendant said that he then asked her for a kiss and she said okay and they kissed "on the lips." A police officer testified that he asked the defendant, "did [T.O.] want to kiss you," and the defendant responded "I don't know."

T.O. testified that several weeks later, she returned home from work around 2:30 p.m. She again ordered a sandwich. While waiting for the sandwich she watched television in her bedroom. The defendant arrived at her home with the sandwich. He testified that he knocked on the door. She testified that she did not hear any knocking. Defendant said he waited three minutes and then opened the door which was unlocked.

T.O. testified as follows. She left her bedroom and found the defendant standing in her living-room with the sandwich. She felt "invaded" because she had not authorized the delivery-person to enter her home. The defendant placed the sandwich on the dining-room table, kissed her and placed his hand inside her slacks. She did not kiss him back and asked him to leave. The defendant followed her to her bedroom where she went to get money to pay for the sandwich. He sat T.O. down on her bed, pulled her pants and underwear down to her ankles, pulled down his pants, threw off his apron and had sexual intercourse with her, which, T.O. testified, "I did not want."

T.O. testified further that when defendant "stuck his penis in my vagina . . . it hurt" but that it did not bother her because she focused on something else. She was trying to think of ways to "get out of it." The defendant ejaculated. He wiped himself on a pink terrycloth bathrobe which he threw into a closet in the bedroom. Prior to leaving, defendant took the money for the sandwich, requested a dollar tip, and told her, "[d]on't tell anyone." After defendant left, T.O. wished to tell her mother what had happened but did not do so because her mother was "under a lot of stress." T.O. washed the bathrobe on which the defendant had wiped himself.

The defendant testified that after he met T.O. in the living-room, he asked her if he could kiss her. He then kissed her, held her hand and later asked if she "want[ed] to do it." She said "yes." They went to T.O.'s bedroom, took off their pants and engaged in consensual sexual intercourse. Defendant said he did not have a condom so "I didn't come in her. I come outside." He testified that T.O. "was not like anything like scared . . . she was happy." Afterwards, T.O. paid defendant and gave him a tip; he said "bye" and left. Defendant acknowledged that he left his apron behind. A police officer testified that when he asked defendant whether T.O. had consented to having intercourse with him, the defendant responded, "I guess so."

The defendant testified that he did not know that T.O. was mentally retarded and did not know about "Down's Syndrome." He understood what T.O. was saying and T.O. appeared to understand what he was saying. According to his testimony, T.O. called him twice later that same day. He told her that he was working at the restaurant and could not return to her home.

T.O. testified that several weeks after the sexual intercourse, the defendant returned to her house. The door was closed but unlocked. She saw him standing at the door to her bedroom. He asked if she liked him. She said she'd have to think about it. She told him to come back because she had to clean up the kitchen. He left.

The defendant testified that he knocked on the door and opened it. T.O. came from the kitchen. The defendant testified:

She goes you. Said how you doing. I said I didn't expect you here. I didn't have the phone to call you but if you don't want me here she said no. But can you come back later. I said let me see if I have time. I said you want me to leave. She said yes. I said okay. I see you later. I see you later.

He testified that when she asked him to leave, he left "right away." T.O. testified that when the defendant left, she called a neighbor because her mother was not home. The neighbor told her to call her mother which she did. Thereafter, the police investigated the matter and arrested the defendant.

## II

### AGGRAVATED SEXUAL ASSAULT

The defendant was charged in count one of the indictment with committing the first degree crime of aggravated sexual assault by sexually penetrating T.O. during the commission of a burglary. The State contends that the burglary consisted of defendant's entering T.O.'s home without permission for the purpose of committing a sexual assault.

The defendant would be guilty of sexual assault, a second degree crime, if he committed:

an act of *sexual penetration* with another person under any one of the following circumstances:

(1) [He] uses *physical force* or coercion but the victim does not sustain severe personal injury;

(2) the victim is one whom [he] knew or should have known was physically helpless, *mentally defective* or mentally incapacitated.

[*N.J.S.A.* 2C:14–2(c)(1)–(2) (emphasis added).]

The defendant would be guilty of aggravated sexual assault, a first degree crime, if he committed

an act of *sexual penetration* with another person under any one of the following circumstances:

(3) The act is committed during the commission, or attempted commission, whether alone or with one or more other persons, of robbery, kidnapping, homicide, aggravated assault on another, *burglary,* arson, or criminal escape.

[*N.J.S.A.* 2C:14–2(a)(3) (emphasis added).]

The State's theory is as follows. The defendant entered T.O.'s home without permission with the purpose to commit the crime of sexual assault. When a person enters a home without permission in order to commit a crime, that conduct constitutes the crime of burglary. If a person commits a sexual assault while in the course of committing a burglary, that conduct constitutes the crime of aggravated sexual assault. Thus, under the State's theory, committing one crime, second degree sexual assault, can become another crime, burglary, which in turn becomes the predicate crime for a third crime, first degree aggravated sexual assault.

The State's theory has an undertone of boot-strapping. Nonetheless, it passes muster. Put in simple factual terms, if the defendant entered T.O.'s home without permission, with a purpose to commit a sexual assault on her, then we find nothing unjust in a classification of that conduct as first degree aggravated sexual assault. The right to safety and security in one's home is fundamental and offers ample justification for a legislative determination that this constitutes a first degree crime.

However, the subtle intricacies of the State's theory highlight the indispensability of a clear and accurate explanation to the jury of the applicable legal principles and how the jury must apply those legal principles to the facts. In this case the judge's charge on count one was incomplete because he did not give a complete description of the elements of sexual assault, the underlying crime. The judge told the jury that the State charged that the defendant "entered [T.O.'s home] with the purpose to commit the crime of sexual assault and I will define sexual assault for you later. For the purpose of burglary, understand that is an offense." The judge had previously defined burglary as entering a structure "without permission" and "with the purpose to commit an offense."

The judge then defined purposely. He advised the jury that "for the defendant to have acted purposely, he must have had a

conscious design or plan to commit a sexual assault when he entered the structure without permission."

Later in the charge, the judge said:

Now we'll deal with the sexual assault counts. The first count in the indictment is aggravated sexual assault and it alleges as follows: That the defendant on or about November 13th, 1992 did commit an act of sexual penetration upon [T.O.] during the commission of a burglary. So you see how the two tie together. That's why I wanted to define burglary for you first.

Act of sexual penetration during the course of a burglary. Our law is as follows: An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person during the commission or attempted commission of a burglary. There are other crimes involved there but they're not important for our purposes.

*So in order for you to find the defendant guilty of this crime, the State is required to prove beyond a reasonable doubt, number one, that on or about November 13th, 1992 the defendant engaged in sexual penetration with [T.O.] Number two, that the defendant acted purposely, and number three, that the act of sexual penetration was committed during the commission of a burglary.*

Now according to our law sexual penetration means vaginal intercourse with the purpose of this particular charge. By the defendant the slightest penetration is sufficient. I've defined purposely for you already. That is that a person acts purposely with respect to the nature of his conduct or the result thereof if it is his conscious object to engage in conduct of that nature or cause such a result and that the act of sexual penetration was committed during the course of a burglary and I've defined burglary for you already.

*So to summarize, the State must prove beyond a reasonable doubt for this count number one aggravated sexual assault that the defendant engaged in sexual penetration with [T.O.]. That he acted purposely and that the act of sexual penetration was committed during the commission of a burglary. If you find that the State has proven all of these elements beyond a reasonable doubt, you should find the defendant guilty of aggravated sexual assault.*

[ (emphasis added).]

In the factual context of this case, this portion of the charge was incomplete and incorrect because the judge did not explain to the jury that where no violence or force is used other than the sexual penetration, then for the sexual penetration to be a sexual assault, the sexual penetration must occur "without the affirmative and freely-given permission of the alleged victim." *In re M.T.S.*, 129 *N.J.* 422, 448, 609 *A.*2d 1266 (1992).

In the *M.T.S.* case, the Court found that the act of sexual penetration required for the crime of sexual assault does not

require any physical force in excess of that inherent in the act of sexual penetration. *Id.* at 444, 609 *A.*2d 1266. The Court said, however, that where

> the State does not allege violence or force extrinsic to the act of penetration, the factfinder must decide whether defendant's act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration. Such permission can be indicated either through words or through actions that, when viewed in the light of all the surrounding circumstances, would demonstrate to a reasonable person affirmative and freely given authorization for the specific act of sexual penetration.
>
> [*Id.* at 447–48, 609 *A.*2d 1266.]

Later in his charge, the judge charged the above *M.T.S.* language regarding the crimes of sexual assault in counts two and three. The judge did not, however, give the *M.T.S.* language to the jury in connection with the crime in count one, aggravated sexual assault.

The failure to charge the *M.T.S.* language in an aggravated sexual assault may not always be an error. In many cases in which the defendant is charged with sexual penetration during the commission or attempted commission of a predicate crime under *N.J.S.A.* 2C:14–2(a)(3), the absence of affirmative permission may not be relevant or perhaps even required. Assume, for example, a burglar enters a home to steal and finds a person in the home. The burglar then commits an act of sexual penetration upon that person. Under these circumstances, the presence or absence of affirmative permission is likely not an issue. Further, the Legislature may not have intended to require the State to prove a lack of affirmative permission under those circumstances. The same would be true if a robber or an arsonist during the commission of the robbery or arson commits an act of sexual penetration on another.

■ Where, however, the State's theory of an aggravated sexual assault is built upon the commission of the crime of burglary which, in turn, is built only upon the commission of the second degree crime of sexual assault, then as a matter of logic and basic fairness, the State must prove the elements of the sexual assault

in order to have the defendant's crime rise to the level of a first degree aggravated sexual assault.

█ In the absence of such a requirement, a miscarriage of justice could easily occur. For example, in the present case the jury could have concluded that to convict for the crime of aggravated sexual assault, the State need only prove that defendant entered T.O.'s home without permission with the purpose to commit an act of sexual penetration upon her. Under the charge given by the judge on count one, aggravated sexual assault, the defendant could have been convicted on that count even if he entered the home intending to commit an act of sexual penetration only if T.O. affirmatively and freely gave her consent. Putting aside for the moment the issue of mental defectiveness, such conduct would not constitute the crime of sexual assault because the State had not proven that the sexual penetration was committed without the affirmative and freely given permission of the alleged victim. *See M.T.S., supra,* 129 *N.J.* at 447–48, 609 *A.*2d 1266.

█ If such conduct did not constitute a sexual assault, then there would be no burglary because the defendant would not have entered for the purpose of committing a crime. Burglary is the predicate crime for aggravated sexual assault. Thus, no burglary means no aggravated sexual assault.

Against this complex backdrop, the charge to the jury must be clear and accurate. We recognize this is easier said than done.[1] Sexual assault crimes pose difficult and often abstruse issues. This was recognized by the Supreme Court in *M.T.S., supra.* The Court said:

---

[1] We are reversing two convictions because of the charge given by the judge. Our reversal, however, should not reflect adversely on the trial judge. The charge was difficult and the judge made a conscientious effort to provide the jury with proper instructions. He also handled the trial in a fair and exemplary manner.

The issues in this case are perplexing and controversial. We must explain the role of force in the contemporary crime of sexual assault and then define its essential features. We then must consider what evidence is probative to establish the commission of a sexual assault. The factual circumstances of this case expose the complexity and sensitivity of those issues and underscore the analytic difficulty of those seemingly-straightforward legal questions.

[*Id.* at 425, 609 *A.*2d 1266.]

The Court also said in *M.T.S.*: "[w]e acknowledge that cases such as this are inherently fact sensitive and depend on the reasoned judgment and common sense of judges and juries." *Id.* at 450, 609 *A.*2d 1266. Here, the jury was seriously handicapped in exercising its "reasoned judgment" and "common sense" because the Court's charge on aggravated sexual assault did not refer to an essential element of sexual assault under *N.J.S.A.* 2C:14–2(c)(1) (sexual assault by physical force), namely the absence of affirmative permission by T.O.

We are mindful that the judge later in the charge correctly advised the jury as to the requirement of lack of affirmative permission. However, the court did so in its instruction to the jury on the sexual assault charge in count two. The judge never tied the requirement of affirmative permission to count one, the aggravated sexual assault.

Further, in charging affirmative permission as to count two but not as to count one, the judge may have exacerbated the problem. Charging affirmative permission as to count two but not as to count one carries an inference that proving the absence of affirmative permission is not necessary for the crime in count one. Put in factual terms, assume the jury concluded that at the time the defendant entered the home, he had a purpose to engage in consensual sexual penetration, i.e. only if he had T.O.'s affirmative permission. The jury may nonetheless have convicted the defendant on count one because the jury mistakenly concluded that consensual sexual penetration was an aggravated sexual assault if the defendant did not have permission to enter the premises.

In any event, the absence of this critical element in the charge on count one was confusing and misleading. This is shown by a series of questions the jury asked during deliberations.

The jury first asked:

Can we get clarification on what "force" is defined as?

And on what sexual penetration using force is?

Is forced (sic) defined by perp[e]trator or victim's perspective?

Can you define the second part of burglary pertaining to sexual assault?

The judge recharged the jury. He defined sexual assault and included the *M.T.S.* principles on affirmative permission. The judge then said:

*As far as the aggravated sexual assault charges (sic) concerned* which is the one that has to do with a sexual assault during the course of the burglary, the statute in question reads that an actor is guilty of aggravated sexual assault if he commits an act of sexual penetration during the commission of a burglary.

*So the elements there don't involve the mental condition of any parties, don't involve the elements of force.* What the State has to prove and prove beyond a reasonable doubt is that on or about November 13th of 1992 defendant engaged in sexual penetration with [T.O.] meaning vaginal intercourse. That the defendant acted purposely. It must be shown that the defendant purposely committed the act of sexual penetration and that the sexual penetration was committed during the commission of the burglary as I have defined burglary for you.

[ (emphasis added).]

Contrary to the judge's instruction, the aggravated sexual assault in this case does involve the mental condition of the parties and physical force. The purpose of the defendant at the time he entered the house, whether there was physical force as defined in *M.T.S., supra,* whether T.O. was mentally defective as defined in *State v. Olivio,* 123 *N.J.* 550, 553, 589 *A.*2d 597 (1991), and the defendant's knowledge of T.O.'s mental defectiveness were relevant to the predicate and underlying crimes of burglary and sexual assault. The judge's instructions as to count one could easily have misled the jury into believing that defendant could be convicted of aggravated sexual assault upon a finding merely of unauthorized entry for the purpose of sexual penetration upon T.O.

The likelihood of confusion and uncertainty on the part of the jury was demonstrated again by the fact that after this recharge and further deliberations, the jury had a new series of questions. This time the jury asked:

Does sexual assault as an element of burglary have to include sexual penetration as the ultimate purpose?

Can we get a strict definition of sexual assault?

Would intention to commit any kind of sexual act be considered sexual assault? (that is not just penetration—something like fondling).

Counsel and the court were uncertain as to what the jury meant by these new questions. Instead of asking the jury for clarification, the judge told the jury that the answer to the jury's first question was "yes" and the answer to the third question was "no." As to the second question, the judge again instructed the jury as to the sexual assault charges in counts two and three, but again did not tie this instruction into the aggravated sexual assault charge in count one. Thus, the judge's second recharge did not correct or clarify the deficiencies in his prior instructions as to count one.

We are mindful that defendant was convicted of second degree sexual assault on count two. We can infer from this conviction that the jury concluded that at the time of the sexual penetration, the defendant did not actually believe that affirmative permission had been freely given by T.O. or if he had such a belief, his belief was unreasonable under all of the circumstances. The conviction on count two does not, however, mean that the conviction under count one must be upheld. Timing in this case is crucial. After the defendant entered the home, he met T.O. in the living-room and interacted with her. He also interacted with her again in the bedroom. The jury could have concluded from what happened in the living-room and in the bedroom that the defendant had formed an intention to penetrate T.O. sexually during those interactions even though her affirmative permission had not been freely given or his belief that it was freely given was unreasonable.

Under these circumstances, his conviction of the sexual assault charge in count two is warranted. However, the defendant's state of mind *after* his interaction with T.O. in the house may not have been the same as *when* he entered the home. Assume the defendant at the time he entered the home intended to engage only in consensual sexual penetration but while inside changed his mind and decided to engage in non-consensual sexual penetration. He would, under those facts, be guilty of sexual assault. However, he would not be guilty of burglary because at the time he entered he did not have a purpose to commit a crime. Because he was not guilty of burglary, the predicate crime for aggravated sexual assault, he would not be guilty of aggravated sexual assault.

The same analysis applies as to the defendant's conviction under count three for committing an act of sexual penetration with a person whom the defendant "knew or should have known was ... mentally defective...." *N.J.S.A.* 2C:14–2(c)(2). Before the interaction in the living-room and bedroom, the defendant's only opportunity to observe T.O. was through a window when he handed her a sandwich and kissed her. That brief encounter may not have been sufficient for the defendant to realize that T.O. was mentally defective. However, after the interaction in the living-room and the bedroom, the jury could have concluded that defendant knew or should have known that T.O. was mentally defective. Thus, the defendant's conviction of the sexual assault charges in counts two and three do not mean that the jury, if properly charged on the aggravated sexual assault charge in count one, would have convicted him of that crime.

To summarize, the jury could have concluded beyond a reasonable doubt that defendant when he committed an act of sexual penetration in T.O.'s home: (1) did not believe that he had T.O.'s affirmative permission (count two); or (2) knew or should have known that T.O. was mentally defective (count three). He therefore could be found guilty on those counts. However, the jury could also have had a reasonable doubt as to whether the defendant: (1) at the time he entered the home had the purpose to

commit an act of sexual penetration with the victim regardless of whether she would freely consent; and (2) at the time he entered the home knew or should have known that T.O. was mentally defective. If the jury had such reasonable doubts, a jury properly charged should have found the defendant not guilty of the first degree crime of aggravated sexual assault in count one.

The incorrect charge and recharges regarding count one cannot be considered harmless error. Erroneous jury instructions are "poor candidates for rehabilitation under the harmless error philosophy." *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979). As the Court stated in *State v. Gartland,* 149 *N.J.* 456, 694 *A.*2d 564 (1997):

> In a long series of cases, we have held that an essential ingredient to a fair trial is that adequate and understandable instructions be given to the jury. The "charge is a road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." We have regularly insisted that courts give content to statutory language in their charges to juries. "[A]n instruction solely in the terms of the language of the statute will [sometimes] not give sufficient guidance to the jury."
>
> Model jury charges are often helpful to trial courts performing this important [charging] function. However, it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime. An instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case.
>
> [*Id.* at 475, 694 *A.*2d 564 (citations omitted).]

Moreover, a judge must always charge the elements of the crime. *State v. Vick,* 117 *N.J.* 288, 291, 566 *A.*2d 531 (1989).

The errors in the charge and recharges in this case were "clearly capable of producing an unjust result" as to count one and require a reversal of the conviction on that count. *See R.* 2:10–2. The possibility of an unjust result in this case is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971); *see also State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987); *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26

*L.Ed.*2d 797 (1970). The conviction on count one must be reversed.

## III

### *BURGLARY*

■ The conviction on count four for burglary must also be overturned. The judge correctly charged that a person is guilty of burglary if the person enters a structure without permission and with the purpose to commit an offense therein. The judge told the jury that the State "charges that the defendant entered the structure with the purpose to commit the crime of sexual assault and I will define sexual assault for you later."

Later in the charge, the judge said:

> In this case if the defendant entered with the sole purpose of making a delivery of a sandwich or a pizza, the State has not proven the elements through burglary. I mean the entry would not have been unlawful and it would not have been for an unlawful purpose. But if in addition to making the delivery you find that the defendant entered with the purpose to commit an offense; namely, a sexual assault, and the State met, the State has met the elements of the case and you should find the defendant guilty.

The judge did not specifically tell the jury that the defendant could not be found guilty of burglary if the defendant entered with a purpose to have consensual sexual relations with a person who was not mentally defective and was capable of consenting. The judge did not define sexual assault until much later in the charge and he did not clearly tie this definition into the burglary charge. Thus, the jury could have easily been misled into reaching an erroneous conclusion that entry without permission with the purpose to commit an act of consensual sexual penetration would alone be sufficient to constitute burglary. In short, the charge on burglary suffers from basically the same deficiencies as the charge on aggravated sexual assault. The burglary conviction must also be reversed.

## IV

### *RAPE SHIELD ACT*

■ In her interviews with the State's and the defendant's psychologists, T.O. said that she had engaged in sexual intercourse on two prior occasions. The judge ruled that this evidence would be barred under the Rape Shield Statute, *N.J.S.A.* 2C:14–7. Defendant contends that this ruling violated his constitutional right to be confronted with the witnesses against him. *See U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. He argues that T.O.'s previous sexual conduct was highly relevant as to whether she was mentally defective. He maintains that introduction of these two sexual experiences would support the testimony of his psychologist and would have permitted effective cross-examination of the State's psychologist.

In *State v. Olivio*, 123 *N.J.* 550, 564, 589 *A.*2d 597 (1991), the Supreme Court stated that a person is mentally defective under *N.J.S.A.* 2C:14–2(c)(2) if he or she is "unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another."

The State's psychologist testified that T.O. understands sexual intercourse, safe sex and body parts. She "intellectually" knows that she has a right to refuse sexual intercourse. The psychologist concluded, however, that "functionally" T.O. could not exercise her right to refuse. He based this conclusion on her inability to generate other alternatives and the stress of the sexual assault.

The psychologist admitted that T.O.'s ability to express herself exceeded her mental condition. He said that based on the way she communicated to other people, "she comes across as having a higher level of ability than her test score would support." He conceded that her "language skills belie the fact that she's mentally retarded."

The psychologist testified at an *in camera* hearing that he had questioned T.O. as to her previous sexual experiences. He testified:

[T.O.] has had two other sexual experiences that she related to this examiner. She stated that when she was still in high school a boy who was a friend of her[s] "demanded me to come over and like the stupid jerk, I went. I though we were going to listen to albums and talk. He was in love with me" since elementary school. [T.O.] stated that she was "pinned." After the sexual assault, she stated that the male "had to use the men's room. I could have left, but I felt sorry (for him) because no one was home." [T.O.] stated that it also happened with a male "across the lake. After he did his thing on me, we played pool and I went home. I wasn't interested. I still don't. I don't want to do this." With regard to her sexual behavior, [T.O.] stated "I want to be a straight person. Not get married. Have no kids."

The defendant's psychologist testified that T.O. was in a "borderline range" between retarded and average functioning. As to her verbal skills, he stated:

[T.O.] was very fluent, very spontaneous [and] spoke in complete sentences. She was engaging—she had a sense of humor. She responded fully and openly to everything I asked her. She appeared very relaxed. She came across as more verbal than the scores would have led me to believe.... She conversed very fluently.

He testified that T.O. was able to appreciate the sexual nature of sexual acts, that she "knew she had the right to say no" to those acts and she was "capable of saying no" to those acts. He testified that she exhibited "signs" of mild Down's Syndrome but he concluded that she was not "mentally defective."

The defense psychologist also asked T.O. about her sexual history. The psychologist stated in his report:

She indicated she was "molested" on two different occasions. On the first occasion she was 19 years old and attending high school. A [person], who was approximately her age, asked if she wanted to "fuck him." Not really knowing what it meant, she said no. He demanded that she come and she went to his place. She added, "I went and he did it." When asked what he did, she said, "I asked him to touch my breasts." He did this and then stuck his penis in her vagina. When asked if she tried to stop him at the time, she said that, "No, we were just high school kids, we didn't know what we were doing." She added that she "let him" have intercourse with her.

On the second occasion she was 19 or 20 and still going to high school and [another person] asked her to play pool at his place. She went. He undid her clothes and, "we hopped into bed." It was voluntary. She knew what she was doing. She let

him have sex with her. At that point, [T.O.] spontaneously told the psychologist that [the first person] did not have a rubber on and [the second person] had a rubber on and Mr. Cuny (sic) did not have a rubber on.

The Rape Shield Statute, *N.J.S.A.* 2C:14–7, provides:

(b) In the absence of clear and convincing proof to the contrary, evidence of the victim's sexual conduct occurring more than 1 year before the date of the offense charged is presumed to be inadmissible under this section.

(c) Evidence of previous sexual conduct with persons other than the defendant which is offered by any lay or expert witness shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease.

[*Ibid.*]

Based on the statute, evidence of T.O.'s prior sexual conduct would be "presumed to be inadmissible" because it occurred more than one year prior to the offense charged. The evidence would also be deemed "irrelevant" because it was not material to "proving the source of semen, pregnancy or disease."

 Statutes like the Rape Shield Statute which attempt to "pre-judge relevancy and admissibility, must not be permitted to defeat defendant's sixth amendment right to confront the witnesses against him, and particularly, his right to a fair opportunity to cross-examination." *State v. Ross,* 249 *N.J.Super.,* 246, 251, 592 A.2d 291 (App.Div.1991); *see also State v. Budis,* 125 *N.J.* 519, 530–41, 593 A.2d 784 (1991).

 Accordingly, if the evidence is relevant and its probative value is not outweighed by its prejudicial effect, then the evidence may not constitutionally be excluded. *Budis, supra,* 125 *N.J.* at 532, 593 A.2d 784; *State v. Clowney,* 299 *N.J.Super.,* 1, 15, 690 A.2d 612 (App.Div.1997). Nevertheless, the right of confrontation "is not absolute and may bow to competing interests, such as fairness, reliability and public policy consideration." *State v. Scherzer,* 301 *N.J.Super.* 363, 412, 694 A.2d 196 (App.Div.1997); *see also Budis, supra,* 125 *N.J.* at 531–32, 593 A.2d 784.

 Furthermore, the scope of the inquiry into sexual history can be appropriately limited by the trial judge. In *Delaware v. VanArsdall,* 475 *U.S.* 673, 679, 106 *S.Ct.* 1431, 1435, 89 *L. Ed.*2d 674, 683 (1986), the United States Supreme Court said:

[I]t does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

[*Ibid.* (quoting *Delaware v. Fensterer,* 474 *U.S.* 15, 20, 106 *S.Ct.* 292, 295, 88 *L.Ed.*2d 15, 19 (1985) (per curiam)).]

In the present case, the trial judge found the evidence to be inadmissible for three reasons: (1) the previous sexual experiences had occurred more than eleven years prior to the incidents in the present case; (2) the prior incidents involved persons known to T.O. as opposed to a stranger in the present case; and (3) factual analysis of the two prior incidents would have necessitated assessment of T.O.'s mental capacity both eleven years prior and at the present time which would tend to confuse the jury.

The judge's reasoning is persuasive. The two incidents have some relevance to the issue of whether T.O. was capable of exercising the right to refuse to engage in such conduct with another. *See Olivio, supra,* 123 *N.J.* at 564, 589 *A.*2d 597; *see also N.J.R.E.* 401 (relevant evidence is evidence which has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action"); *State v. Garfole,* 76 *N.J.* 445, 452–53, 388 *A.*2d 587 (1978) (in criminal cases, there is a reduced standard of relevancy because the accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence); *State v. Deatore,* 70 *N.J.* 100, 116, 358 *A.*2d 163 (1976) (the test of relevancy is "broad and favors admissibility"); *Lowenstein v. Newark Bd. of Educ.,* 35 *N.J.* 94, 105, 171 *A.*2d 265 (1961) (in considering relevancy, "a certain amount of leeway" is allowed to the party offering the challenged evidence).

However, the probative value of this evidence is insubstantial. The previous sexual experiences were far in the past when T.O.

was a teenager. They involved acquaintances of T.O.'s, not strangers. Moreover, T.O.'s acquiescence in those encounters would tend to support, not refute the opinion of the State's expert that she was functionally incapable of exercising her right to refuse. *See Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784 (the probative value of prior acts depends on "clear proof" that the acts are "necessary to the defense").

In addition, an extended inquiry into those incidents would tend to mislead the jury and unduly harass the victim of a crime. *See N.J. Const.* art. I, ¶ 22 ("A victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system."); *see also N.J.S.A.* 2C:14–7(a) (requiring consideration of whether evidence of prior sexual conduct will "create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim"). The only substantial impact of presenting T.O.'s two previous sexual experiences would be to foster the impermissible inference that the Rape Shield Statute was intended to refute, namely, that an "unchaste woman is more likely to consent to a sexual assault." *See Budis, supra,* 125 *N.J.* at 540, 593 *A.*2d 784; *Clowney, supra,* 299 *N.J.Super.* at 16, 690 *A.*2d 612 ("the clear import of defendant's proffer [to denigrate the victim's reputation] countervailed the rape shield law's purpose").

Further, the trial judge's determination of the proper balance of the competing interests, *see Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784, should be given considerable weight. The rape shield hearing took place in the middle of the trial. The trial judge by that time had acquired a "feel" of the case which we cannot have from a cold record. *See State v. Johnson,* 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964).

In sum, we have closely examined the competing interests as required by *Chambers v. Mississippi,* 410 *U.S.* 284, 295, 93 *S.Ct.* 1038, 1046, 35 *L. Ed.*2d 297, 309 (1973), and find that the ultimate integrity of the factfinding process in this case was not infringed upon by the judge's exclusion of these two instances of sexual conduct.

## V

### OTHER ISSUES

We have considered the defendant's remaining contentions and are satisfied that they do not have sufficient merit to warrant extensive discussion in a written opinion. *See R.* 2:11–3(e)(2). We briefly comment as follows.

 The judge should have instructed the jury in accordance with *State v. Hampton,* 61 *N.J.* 250, 294 *A.*2d 23 (1972) and *State v. Kociolek,* 23 *N.J.* 400, 129 *A.*2d 417 (1957) as to the defendant's oral statements to the police. However, the difference between the defendant's testimony and the police officer's testimony as to what the defendant said is insubstantial. The failure in this case to give the jury a *Hampton* and *Kociolek* charge is not "clearly capable of producing an unjust result." *See State v. Jordan,* 147 *N.J.* 409, 425–28, 688 *A.*2d 97 (1997) (the failure to give a required *Hampton* or *Kociolek* charge or both is not *per se* reversible error); *see also* R. 2:10–2.

We agree with the judge's ruling that there was no evidence in the record to support acts of coercion as defined by *N.J.S.A.* 2C:13–5(a). Consequently, the judge properly denied defendant's request for an instruction to be given on coercion.

 Both the defendant and T.O. testified that vaginal intercourse had occurred. Consequently, the judge properly denied the prosecution's request to charge the jury as to the crime of sexual contact, a crime not involving vaginal intercourse but rather an intentional touching of the victim's intimate parts. *See N.J.S.A.* 2C:14–1(d). The judge is required to charge the jury on a lesser included offense only if there is "a rational basis for a verdict convicting the defendant of the included offense." *N.J.S.A.* 2C:1–8(e); *see also State v. Moore,* 113 *N.J.* 239, 289, 550 *A.*2d 117 (1988). Here, there was no rational basis for a conviction of sexual contact.

Contrary to the defendant's contention, the judge did give the jury a comprehensive and proper charge on the lesser-included offense of criminal trespass. We find no merit in the defendant's contention regarding the jury *voir dire;* nor do we find prosecutorial misconduct in the prosecutor's comments during the trial. We also note that the issue of alleged ineffective assistance of counsel can be better determined on an application for post-conviction relief. *See State v. Preciose,* 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992).

To summarize, defendant's convictions on counts two (sexual assault by use of physical force), count three (sexual assault on a mentally defective person) and count five (criminal trespass) are affirmed. The defendant's convictions on count one (aggravated sexual assault) and count four (burglary) are reversed and the case is remanded for a new trial on those charges. The defendant was not sentenced on count two because it was merged into count one. Our reversal of the conviction on count one requires that the defendant now be sentenced on count two.

Affirmed in part. Reversed and remanded in part.

PRESSLER, P.J.A.D., dissenting.

I agree with the analysis by the majority opinion of the issues raised by this appeal except for its conclusion respecting the evidential bar of the Rape Shield Law, *N.J.S.A.* 2C:14–7. I therefore respectfully dissent from Point IV of the majority opinion and would reverse defendant's convictions of the two sexual assault counts as well.

I do not question the salutary purpose and policy of the Rape Shield Act. The problem is simply that the defendant's constitutional right to confrontation takes precedence, and if the victim's prior sexual conduct is relevant and material to the defense, that evidence may not be barred by reason of the constraints imposed by the Act. That is the teaching of *State v. Budis,* 125 *N.J.* 519, 593 *A.*2d 784 (1991). I understand that resolution of the tension between the Rape Shield Law and defendant's right of confronta-

tion requires delicate balancing. As we recently said in *State v. Clowney*, 299 *N.J.Super.* 1, 15, 690 *A.2d* 612 (App.Div.1997), in which we found the balance to weigh in the victim's favor:

> That issue [whether application of the Act denied defendant of his defense to the rape charge] requires a review as to whether the evidence was relevant and highly material to the defense and whether its probative value outweighs its prejudicial effect. [*Budis, supra,* 125 *N.J.* at 532, 593 *A.2d* 784]. "The proper balance of relevance and prejudicial effect depends on the facts of each case." *Id.* at 533 [593 *A.2d* 784]. Where the probative value of the prior conduct outweighs the prejudice, "the evidence may not constitutionally be excluded." *Id.* at 532 [593 *A.2d* 784]. However, "[t]he probative value of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." *Id.* at 533 [593 *A.2d* 784].

My review of the record in what I regard as an extremely close case persuades me that the balance here clearly weighed in defendant's favor.

Defendant's defense was simply that he believed the victim had consented to and was a willing participant in an act of sexual intercourse and that he had no reason to believe that she was mentally defective and therefore lacked the capacity to give consent. The State's position was that the victim was not willing, that she did not have the capacity to refuse defendant's advances, and that defendant should have so understood. I consider these two disparate views of what happened in the light of two pieces of evidence which I regard as central to the perceptions, both expressed and unexpressed, of the two participants in this most unfortunate and regrettable encounter. First, as pointed out by the majority opinion, is the expert testimony adduced by the State that the victim appears to function at a higher level than her limitations actually allow. See opinion at 605, 697 A.2d at 561, where the majority notes the psychologist's opinion that "based on the way she communicated to other people, 'she comes across as having a higher level of ability than her test score would support' " and " 'her language skills belie that fact that she's mentally retarded.' " Second is the fact that defendant, an Albanian political refugee, is unskilled in English and, therefore, unlikely to appreciate the verbal cues implicit in a sexual encounter or, indeed, in any normal social intercourse.

It is against this backdrop that the evidential issue is raised. In short, the victim had told the psychologist about two prior sexual experiences she had had ten years prior. The majority opinion quotes the psychologist's *in camera* testimony respecting the victim's description of these events, and I need not repeat it. Suffice it to say that I find that testimony highly relevant to defendant's defense. That is to say, the issue as I understand it was not whether the victim had or had not consented to sexual intercourse with defendant but rather whether she had the capacity to have refused to consent. Based on the psychologist's hearsay, I am satisfied that defendant had the confrontational right to explore these matters with the victim herself. The victim's prior experiences, the contexts in which they occurred, and her own later analysis of them and feelings about them were, in my view, clearly material to the question of whether she had the capacity to have said "no." By the same token, I am also of the view that these prior experiences and their effect on her were relevant as well to the issue of defendant's perception of a mental limitation that might have counterindicated her capacity to refuse. I conclude, therefore, that he had the right to inquire into these matters at trial—not to embarrass the victim or to invade her privacy or to suggest to the jury that since she was no stranger to sex, she had given her consent on this occasion, but rather to support his defense that he reasonably believed he had made successful advances to a willing partner capable of consenting. In my view, precluding him from so doing improperly impinged upon his constitutional right of confrontation.

I would reverse the sexual assault convictions and remand for a new trial.