733 A.2d 414

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. AZEM CUNI, DEFENDANT–APPELLANT.

Argued September 29, 1998—Decided June 14, 1999.

*J. Michael Blake,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, defendant was convicted of the sexual assault of a mentally defective person. At trial, defendant attempted to introduce evidence of the victim's past sexual experiences through the cross-examination of the State's expert psychologist. The purpose of that evidence, according to defendant, was to demonstrate that the victim had the capacity to consent to sexual relations despite her mental condition. The trial court ruled that defendant could not elicit the evidence.

The issue posed by this appeal is whether, in a sexual assault case in which the State claims the victim lacked the mental capacity to withhold consent to sexual acts, the New Jersey Rape Shield Law, *N.J.S.A.* 2C:14–7, may be applied to exclude evidence of past sexual conduct that is offered to show that the victim had the mental capacity to consent to sexual contact. If such evidence is excluded, we also address whether that exclusion violates the defendant's constitutional right to confront witnesses.

I

Defendant, Azem Cuni, was indicted and tried for first degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a(3); second degree sexual assault, contrary to *N.J.S.A.* 2C:14–2c(1) and (2); third degree burglary, contrary to *N.J.S.A.* 2C:18–2; and fourth degree criminal trespass, contrary to *N.J.S.A.* 2C:18–3. At the conclusion of trial, the jury returned guilty verdicts on all counts. The court thereafter merged the burglary charge and the sexual assault charge under *N.J.S.A.* 2C:14–2c(1) into the aggravated sexual assault charge, sentenced defendant to an aggregate term of twelve years in prison, and imposed appropriate penalties.

Defendant appealed his convictions. The Appellate Division reversed the convictions for aggravated sexual assault and burglary. 303 *N.J.Super.* 584, 697 *A.*2d 550 (1997). The court found that the trial court erred by not instructing the jury that, in order to convict defendant of burglary and aggravated sexual assault based on that burglary, defendant had to have entered the victim's house with the intention to engage in sexual penetration without her consent. *Id.* at 598, 604, 697 *A.*2d 550 . Because the failure to so instruct was "capable of producing an unjust result," the court reversed both the aggravated sexual assault and the burglary convictions. *Id.* at 603–04, 697 *A.*2d 550. The court affirmed the other convictions, finding no reversible error in defendant's remaining contentions. *Id.* at 610–11, 697 *A.*2d 550. Judge Pressler dissented on the ground that defendant's two sexual assault convictions should also be reversed because evidence of the victim's two past sexual experiences were excluded under the Rape Shield Law, violating defendant's right to confrontation. *Id.* at 611–13, 697 *A.*2d 550.

Defendant appealed the Appellate Division's decision as of right based on the dissent, pursuant to *R.* 2:2–1(a)(2). Defendant also petitioned for certification on two additional issues. The Court denied that petition. 152 *N.J.* 12, 702 *A.*2d 351 (1997).

## II

In 1992, the victim, T.O., was thirty years old and lived with her younger sister and mother in a house in Jefferson Township. T.O. had been tested as being in the borderline range for being mentally deficient.[1]

One afternoon in late October 1992, T.O. ordered a sandwich from a local pizzeria for home delivery. Defendant soon thereafter arrived at T.O.'s door with her order. Because T.O. did not possess a key to the locked front door, T.O. opened a window in order to retrieve her sandwich. Defendant bent down and kissed T.O. through the window, using his tongue. T.O. testified that she "didn't want it." Defendant told T.O. that people at the pizzeria were talking about her and saying that she was a beautiful person. T.O. then paid for her sandwich and defendant departed.

Two or three weeks later, T.O. again ordered a sandwich from the pizzeria. T.O., who was home alone, watched television in her bedroom while waiting for the delivery. After twenty-five minutes had passed without a knock, T.O. moved to the livingroom to wait for the delivery. There she encountered defendant standing in the room. T.O. had not given defendant permission to enter her home and felt "invaded" by his presence.

T.O. testified that defendant then "start[ed] getting funny with me. He start[ed] kissing me on my lips and then he start[ed] going down in my pants. . . ." Although T.O. did not want to kiss defendant, she did not say anything at the time. T.O. then asked defendant to leave and went into her room in order to get money to pay for the sandwich. Defendant did not respond, but instead followed T.O. into her room. T.O. described what transpired:

---

[1] T.O. scored a 70 on a 1981 I.Q. test, with a range of error of plus or minus 5 points; 69 or below is considered mentally deficient. According to the experts, even though T.O.'s "verbal skills are much better than someone who is mentally retarded, beyond what her test scores would otherwise indicate," her test scores showed that she is on the borderline of being mentally deficient, "in the range between retarded functioning and average functioning."

"We go over to my bed. He sits me down on the corner and then he proceeds to pull my pants—my undershorts and my slacks down to my ankles and he does his thing." By "does his thing," T.O. meant that defendant had sexual intercourse with her against her will. Before leaving, defendant instructed T.O. not to tell anyone about the encounter.

T.O. testified that defendant hurt her with the force of sexual penetration. As T.O. described it, however, the pain did not "bother me because I wasn't really paying close attention, you know. I was thinking of some other stuff ... I was unhappy when he did it, I was scared, but it just didn't cross my mind of what he was doing." T.O. pondered "ways to get out of it," such as "hid[ing] down in [her] sister's room and call[ing] the cops from there ... [or hiding] upstairs in the attic with [her] father's airgun rifle just to scare [defendant] away."

About two weeks later, on November 28, defendant returned to T.O.'s house and entered without knocking. T.O. was alone when defendant appeared in her bedroom doorway. She spoke first and said, "You." Defendant asked T.O. if she liked him, and she told him she would have to think about it and for him to come back later. As T.O. described it, "Then it clicks. I knew exactly what he did.... I got the telephone, called my neighbor.... I asked her if I could come over. She said why, and I told her that somebody sexually molested me." The neighbor told T.O. to call her mother. T.O. followed those instructions and informed her mother that "somebody was taking advantage of me."

On November 30, 1992, Detective John Kessler of the Jefferson Township Police Department interviewed T.O. about the incident. T.O. provided Detective Kessler with a description of defendant and his place of employment. Detective Kessler went to the pizzeria where he found defendant. Defendant agreed to be interviewed by Kessler at the police station, where he subsequently waived his constitutional rights and admitted to having sex with T.O. He stated that he "did her" and that he "guessed" that she wanted to have sex with him as well. When asked whether he

told T.O. not to tell anyone about the incident, defendant did not respond. Defendant said that he was only familiar with T.O. from delivering food to her home "a couple of times." Defendant told Detective Kessler that the first time he kissed T.O., he did not know whether she wanted him to. Detective Kessler never asked defendant whether he believed that T.O. was mentally defective.[2]

At trial, defendant claimed that both encounters with T.O. were consensual, that she was not mentally defective, and that, if she was mentally defective, he did not know nor should he have known. Defendant testified that when he first kissed T.O. through the window, he told her that she was good looking and she responded "yes, I am, you know." He also claimed that he asked for and received permission to kiss her. Defendant further testified that when T.O. placed her second order, she requested that he deliver it. He claimed that he knocked on the door, and only opened it after he saw her through the window walking toward the door. Once encountering T.O. on entering the room, he again asked her permission to kiss her; the two then kissed and held hands. Defendant claimed that he then asked T.O. if she wanted "to do it" and she led him into her bedroom where they had sex. Afterwards, defendant said T.O. appeared "happy, not scared." Defendant claimed that he had no idea that T.O. was mentally defective. Defendant also testified about the final encounter, asserting that when T.O. told him to leave and come back later, he agreed to do so.

The State produced Dr. Anthony D'Urso, who testified as an expert in the field of clinical psychology. After meeting with T.O. twice, reviewing her childhood evaluations, and conducting several different tests, Dr. D'Urso concluded that T.O.

---

[2] The mental ability of defendant is uncertain. Psychological testing found him to be "mentally deficient," indicating "some possibility of underlying neurological impairment." The fact that English is not his native language, however, may have skewed the test result. Further, defendant's psychological report states that the test result "seems to be an underestimate of his true intellectual potential."

lacked any functional ability to understand the sexual assault and her ability to stop the sexual assault [and that] although she is knowledgeable about sexual activity and can talk about it in the concrete, apart from a stressing or assaultive experience that her functional ability to say no, to fend against such an action and not comply with the requests of the assaultive person puts her in the mentally deficient range.

Dr. D'Urso testified further about T.O.'s knowledge of sex and understanding of consent:

Q: And again can you tell us what you mean by she understands concretely what these things are?

A: She knows that intercourse is where a penis is inserted in a vagina. She knows that prophylactics are used for safe sex. She knows that people don't have the right to invade your body. Those are the kind of things that in the concrete she would know. In other words, she can say those rotely to you. She can understand that people have a right to the integrity of their bodies and she can talk to you about the fact that no one has a right to assault anyone else.

Q: So she knows that she has a right to refuse?

A: She intellectually knows that she has a right to refuse, yes.

The expert was then asked whether T.O. had the "ability to resist, to exercise that right to refuse." He answered:

I do not functionally believe she has the right to refuse. . . . As a matter of circumstance, when someone is forcing themselves on her, when someone is telling her words and saying things, when people are manipulating her body and touching her, putting her in positions on beds, it is my clinical judgment that she doesn't have the functional ability to say no. . . .

Dr. Ronald Silikovitz, a psychologist for defendant, testified that he questioned T.O. about sex in interviews and concluded that she knew the nature of sexual acts and "[s]he knew she had the right to say no." He testified further:

She is aware of the mechanics, the anatomy, the physiology and the implications of sexual acts including kissing all the way up through intercourse. She's aware of all that. She can define it. She can verbalize it. She's aware of consequences if you do this this will happen. She's aware about condoms and knows what happens when you do and don't use condoms and she discussed that with me. She certainly I believe knew she had the right to say no and I think she was capable of saying no. I also find a very explicit sexual fantasy in the projective testing.

During the trial, the chief issue was the admission of evidence of T.O.'s past sexual experiences. In her interviews with both experts, T.O. related two sexual incidents occurring eleven years earlier.[3]

---

[3] In his report, the State's expert, Dr. D'Urso, referred to T.O.'s description of those two incidents:

On cross-examination of Dr. D'Urso, defense counsel asked whether he had questioned T.O. about her prior sexual conduct. After Dr. D'Urso answered that he had, the State objected, arguing that the Rape Shield Law barred the testimony. Dr. D'Urso further explained, in response to the court's inquiry, that he asked T.O. about her past "to understand what she knew about sexuality and what she knew about intercourse and how she experienced those behaviors before." That history was "just one piece" of the information he used to come to his conclusions about T.O.'s capacity to consent. He also indicated that T.O.'s eleven year period of abstinence since the encounters was significant because it showed that her experience was "typical [ ] of people

---

[T.O.] has had two other sexual experiences that she related to this examiner. She stated that when she was still in high school a boy who was a friend of her[s] "demanded me to come over and like the stupid jerk, I went. I thought we were going to listen to albums and talk. He was in love with me" since elementary school. [T.O.] stated that she was "pinned." After the sexual assault, she stated that the male "had to use the men's room. I could have left, but I felt sorry (for him) because no one was home." [T.O.] stated that it also happened with a male "across the lake. After he did his thing on me, we played pool and I went home. I wasn't interested. I still don't. I don't want to do this." With regard to her sexual behavior, [T.O.] stated "I want to be a straight person. Not get married. Have no kids." Defendant's expert, Dr. Silikovitz, also recounted T.O.'s description to him of the same two incidents:

The psychologist asked [T.O.] about her history of sexual contact. She indicated she was "molested" on two different occasions. On the first occasion, she was 19 years old and attending high school. A [male], who was approximately her age, asked her if she wanted to "f— him." Not really knowing what it meant, she said no. He demanded that she come and she went to his place. She added, "I went and he did it." When asked what he did, she said, "I asked him to touch my breasts." He did this and then he stuck his penis in her vagina. When asked if she tried to stop him at the time, she said that, "No, we were just high school kids, we didn't know what we were doing." She added that she "let him" have intercourse with her.

On the second occasion she was 19 or 20 and still going to high school and [another male] asked her to play pool at his place. She went. He undid her clothes and, "we hopped into bed." It was voluntary. She knew what she was doing. She let him have sex with her. . . .

who were cognitively limited on how sexual experiences typically occur."

The trial court ruled that the testimony was not admissible. The court determined that defense counsel had failed to comply with the procedural requirements of the Rape Shield Law because he did not before trial apply to the court for an order to admit T.O.'s sexual history into evidence. On the merits of the claim, the court ruled that the evidence should be excluded for the following reasons: the passage of time made the evidence's relevance suspect; the incidents in the past are not similar enough to the present incident because the past incidents involved friends and the present incident involves a stranger; and, admitting the evidence would distract the jury by "delving into the circumstances of those cases and trying to assess what [T.O.'s] mental capacity may have been at the time."

### III

The defendant was charged and convicted of sexual assault under *N.J.S.A.* 2C:14–2c(1) and (2):

An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:

(1) The actor uses physical force or coercion, but the victim does not sustain severe personal injury;

(2) The victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated[.]

[*Ibid.*]

Under *N.J.S.A.* 2C:14–2c(2), a person is considered "mentally defective" if he or she has a mental defect that renders him or her "unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another." *State v. Olivio,* 123 *N.J.* 550, 564, 589 *A.*2d 597 (1991). Under that standard, because the State and its expert acknowledged at trial that T.O. understood "the distinctively sexual nature of the conduct" and her "right to refuse to engage" in that conduct, the question before the jury was whether T.O. was "incapable of . . . exercis-

ing" that right, *ibid.*, that is, whether the victim had the *capacity* to consent.

The Legislature enacted the first Rape Shield Law, *N.J.S.A.* 2A:84A–32, in 1976. The Legislature enacted the current Rape Shield Law, *N.J.S.A.* 2C:14–7, as part of the revision of the New Jersey Code of Criminal Justice in 1979. After a technical amendment in 1988, the law read as follows:

a. In prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, or endangering the welfare of a child in violation of *N.J.S.* 2C:24–4, evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except as provided in this section. When the defendant seeks to admit such evidence for any purpose, he must apply for an order of the court before the trial or preliminary hearing, except that the court may allow the motion to be made during trial if the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence. After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and that the probative value of the evidence offered is not outweighed by its collateral nature or by the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies the standards contained in this section. The defendant may then offer evidence under the order of the court.

b. In the absence of clear and convincing proof to the contrary, evidence of the victim's sexual conduct occurring more than 1 year before the date of the offense charged is presumed to be inadmissible under this section.

c. Evidence of previous sexual conduct shall not be considered relevant unless it is material to negating the element of force or coercion or to proving that the source of semen, pregnancy or disease is a person other than the defendant.[4]

---

[4] After the trial in this case, the Legislature amended *N.J.S.A.* 2C:14–7. The relevant changes follow (added words are underlined, removed words are stricken):

a. In prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, endangering the welfare of a child in violation of *N.J.S.* 2C:24–4 *or the fourth degree crime of lewdness in violation of subsection b. of N.J.S. 2C:14–4,* evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except as provided in this section. . . . If the court finds that evidence offered by the defendant regarding the sexual conduct of the

[*N.J.S.A.* 2C:14–7 (1988).]

This Court has stated that the purposes of the statute are "to protect rape victims from excessive cross-examination, thereby encouraging them to report the abuse . . . [and to] preserve the integrity of trials . . . [b]y ensuring that juries will not base their verdicts on prejudice against the victim. . . ." *State v. Budis,* 125 *N.J.* 519, 529, 593 *A.*2d 784 (1991) (citation omitted).

## A.

The trial court ruled that the evidence of T.O.'s past sexual experiences was not admissible under the Rape Shield Law because defendant failed to comply with the procedural requirements of the statute. The statute provides that if the defendant seeks to admit the evidence for "any purpose," the defendant must apply for a court order *"before* the trial or preliminary hearing." *N.J.S.A.* 2C:14–7a (emphasis added). The only exception to that requirement provided in the statute is when there is "newly discovered [evidence that] could not have been obtained earlier through the exercise of due diligence." *Ibid.*

[2] Barring the admission of evidence on a procedural ground raises constitutional issues implicating the right to confront witnesses. In *Michigan v. Lucas,* 500 *U.S.* 145, 111 *S.Ct.* 1743, 114 *L.Ed.*2d 205 (1991), the United States Supreme Court dealt with the issue of a procedural preclusion under Michigan's rape shield law and the defendant's constitutional right to confrontation. *Id.*

---

victim is relevant *and highly material and meets the requirements of subsections c. and d. of this section* and that the probative value of the evidence offered *substantially outweighs* its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, . . . .

. . . .

c. Evidence of previous sexual conduct *with persons other than the defendant which is offered by any lay or expert witness* shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease.

[*N.J.S.A.* 2C:14–7.]

at 146, 111 *S.Ct.* at 1744, 114 *L.Ed.*2d at 210. The Supreme Court held that the statute is not *per se* unconstitutional because there were "legitimate state interests support[ing] the notice-and-hearing requirement." *Id.* at 149, 111 *S.Ct.* at 1746, 114 *L.Ed.*2d at 212. Those interests included guarding against surprise, harassment and invasion of the victim's privacy; guarding against surprise to the prosecution; and enhancing the fairness of the adversary system. *Id.* at 150–51, 111 *S.Ct.* at 1747, 114 *L.Ed.*2d at 212–13. Failure to comply with the procedural requirement could, without violating the United States Constitution, justify preclusion. *Id.* at 153, 111 *S.Ct.* at 1748, 114 *L.Ed.*2d at 214.

We have similarly recognized that the right to confront witnesses is one that must be factored into the application of the Rape Shield Law and, although that right is one of the " 'minimum essentials of a fair trial,' " *Budis, supra,* 125 *N.J.* at 531, 593 *A.*2d 784 (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 294–95, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973)), it "is not absolute, and may, in appropriate circumstances, bow to competing interests." *Ibid. See State v. Scherzer,* 301 *N.J.Super.* 363, 417, 694 *A.*2d 196 (App.Div.) (holding in light of *Lucas, supra,* that "[u]nder the Rape Shield Law's procedural requirement, as with any discovery rule violation, the trial judge enjoys broad discretion to determine what sanctions, including preclusion of evidence, should be imposed."), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997).

▮ Thus, under the Rape Shield Law itself, preclusion is the remedy for procedural non-compliance. Under *Lucas,* however, the constitution confers discretion in the application of that remedy if the court finds that under the facts of the specific case preclusion violates the defendant's right to confront witnesses. *Lucas, supra,* 500 *U.S.* at 153, 111 *S.Ct.* at 1748, 114 *L.Ed.*2d at 214–15. *Scherzer, supra,* listed factors relevant to that determination:

(1) was defendants' discovery violation due to willful misconduct (e.g., was it a tactical decision); (2) would a mid-trial proffer have caused unfair surprise to the State; (3) were there alternatives to exclusion (e.g., recess, continuance, prosecuto-

rial comment on discovery violation) and (4) the impact of witness preclusion on the outcome of the trial.

[301 *N.J.Super.* at 418, 694 *A.*2d 196 (citing *Fendler v. Goldsmith,* 728 *F.*2d 1181, 1187–88 (9th Cir.1983); *State v. Caffee,* 220 *N.J.Super.* 34, 37, 531 *A.*2d 378 (App.Div.1987)).]

Based on those factors, the trial court's determination that defendant's procedural non-compliance required exclusion of the evidence was justified. The prosecutor specifically claimed that under the statute the matter should have been brought before the court prior to trial, and that attempting to introduce the evidence in the middle of the trial prejudiced the State. Defense counsel contended that he did not know before trial that he would introduce the evidence, and therefore, he did not bring it to the court's attention. Because the defense had Dr. D'Urso's report, as well as that of its own expert, before trial, however, it clearly had the basis for making an informed decision on whether at trial it would seek to rely on evidence of T.O.'s sexual history. Further, the introduction of such evidence mid-way through the trial without any prior application or warning, in effect, blindsided the State and, in the face of that surprise, left it with no practical alternative to exclusion. Finally, exclusion was the appropriate remedy because, with an already impaneled jury, delay would have been inefficient and distracting.

In sum, the State's "legitimate [ ] interests in protecting against surprise, harassment, and undue delay[,]" *see Lucas, supra,* 500 *U.S.* at 153, 111 *S.Ct.* at 1748, 114 *L.Ed.*2d at 214, and the absence of any reasonable or legitimate excuse or alternative remedies, *Scherzer, supra,* 301 *N.J.Super.* at 418, 694 *A.*2d 196, support the procedural exclusion of the evidence in this case.

B.

Procedural preclusion invites consideration of the impact of that remedy on adversarial fairness, *Lucas, supra,* 500 *U.S.* at 151, 111 *S.Ct.* at 1748, 114 *L.Ed.*2d at 214, and on the outcome of the trial itself. *Scherzer, supra,* 301 *N.J.Super.* at 418, 694 *A.*2d 196. That consideration implicates the merits of the decision to preclude

evidence under the Rape Shield Law. It requires an inquiry into the substantive basis for the preclusion of the evidence of T.O.'s sexual history, and the right of defendant to confront adverse witnesses.

Whenever the confrontation rights of a defendant are considered in connection with the State's interest in excluding evidence under the Rape Shield Law, courts must engage in a two-step analysis: first, "whether the evidence was relevant to the defense[,]" and second, "[i]f the evidence is relevant ... whether its probative value outweighs its prejudicial effect." *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784.

The Appellate Division in this case applied the proper standard, stating that "if the evidence is relevant and its probative value is not outweighed by its prejudicial effect, then the evidence may not constitutionally be excluded." 303 *N.J.Super.* at 607, 697 *A.*2d 550. The court determined that the evidence was only slightly relevant and without measurable probative worth because the two incidents occurred so far in the past. *Id.* at 608–09, 697 *A.*2d 550. Furthermore, the court recognized the prejudice inherent in such evidence, explaining that inquiry into those incidents would tend to "harass the victim" and also raise the "impermissible inference" that "an 'unchaste woman is more likely to consent to a sexual assault.'" *Id.* at 609, 697 *A.*2d 550 (quoting *Budis, supra,* 125 *N.J.* at 540, 593 *A.*2d 784). Finally, the court observed that it had to give "considerable weight" to the trial court's determination of the competing interests. *Ibid.* The dissent, in disagreeing with the majority's application of the Rape Shield Law to this case, reasoned that "defendant's constitutional right to confrontation takes precedence, and if the victim's prior sexual conduct is relevant and material to the defense, that evidence may not be barred by reason of the constraints imposed by the Act." *Id.* at 611, 593 *A.*2d 784. "The victim's prior experiences, the contexts in which they occurred, and her own later analysis of them and feelings about them[,]" according to the dissent below, "were ... clearly material to the question of whether she had the capacity to

have said 'no.'" *Id.* at 613, 593 *A*.2d 784. Those conclusions are adopted by Justice Stein's dissent. *Post* at 608–09, 733 *A*.2d at 427–28.

The first question is, "apart from the Rape Shield Statute, whether the evidence was relevant to the defense." *Budis, supra,* 125 *N.J.* at 532, 593 *A*.2d 784. Under *N.J.R.E.* 401, evidence is relevant if it has a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." In answering that question, the focus in this case is whether the evidence is relevant to the victim's capacity to consent or, more precisely, her capacity to withhold or refuse consent to unwanted sexual contact.

The capacity to consent is gauged by the mental ability of the victim at the time of the sexual conduct: "[A] person is mentally defective under *N.J.S.A.* 2C:14–2c(2) if, *at the time of the sexual activity,* the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another." *Olivio, supra,* 123 *N.J.* at 564, 589 *A*.2d 597 (emphasis added). Here, T.O.'s past experiences occurred eleven years earlier at a time when T.O. was still in school. Any evidential connection between T.O.'s prior sexual experiences and the current sexual encounter with defendant is remote and attenuated. *Shaw v. United States,* 892 *F.Supp.* 1265, 1275–78 (D.S.D.1995) (rejecting evidence that victim engaged in sex acts five or six years before charged crime as too remote and lacking probative worth), *aff'd,* 92 *F*.3d 1189 (8th Cir.1996). T.O.'s prior sexual experiences cannot be viewed as relevant to her capacity to consent or to withhold or refuse consent. Past consensual sexual experiences—as opposed to previous incidents where a victim effectively *refused* consent—are not sufficiently probative to demonstrate the capacity to consent. *Compare State v. Anderson,* 137 *Or.App.* 36, 902 *P*.2d 1206, 1208, *review denied,* 322 *Or.* 362, 907 *P*.2d 249 (1995) (upholding under rape-shield statute exclusion of statements that defendant heard regarding victim's sexual

reputation because they were not probative of victim's capacity to consent; noting that "to avoid culpability, defendant had to show that he 'did not know of the facts or conditions responsible for the victim's incapacity to consent.' Here, those 'facts or conditions' that are responsible for the victim's incapacity to consent are her mental retardation.") *with State v. Frost,* 141 *N.H.* 493, 686 *A.*2d 1172, 1178 (1996) (noting that proffered testimony by prior boyfriend that he and victim *refrained* from certain sexual activities because victim *refused to consent* was deemed highly probative of issue of her capacity to decide whether or not to consent).

In neither of the two prior experiences does it appear that T.O. was unwilling or reluctant to engage in the sexual acts. Nor does it appear that T.O. exercised or sought to exercise her right to say no and refuse to consent. In the first incident involving a friend, "she 'let [her friend]' have intercourse with her." In the second, T.O. and her acquaintance voluntarily "hopped into bed" and T.O. "let him have sex with her." There is no indication that T.O. was not a willing participant in either sexual encounter, whereas in respect of the offense charged here there is evidence that the sexual assault was unwanted and uninvited by her. These prior incidents, therefore, do not tend to prove that T.O. had the ability to exercise consent. The critical issue in this case is the victim's capacity to consent in the sense that if she was unwilling to engage in sexual acts, she had the mental and emotional ability to refuse. The inquiry, therefore, centers on T.O.'s mental condition and state of mind that would reflect that incapacity when the sexual conduct occurred. Prior acts of intercourse that appear consensual and do not implicate any incapacity to refuse sexual advances cannot demonstrate that the victim had the actual ability to consent to the charged sexual assault—"because the prior acts may have occurred due to the same lack of capacity." *Frost, supra,* 686 *A.*2d at 1178.

Defendant also claimed as part of his defense that even if T.O. was incapable of exercising her right to consent, he did not know, nor did he have any reason to know, that she was not so able.

The issue then is whether evidence of T.O.'s past sexual experience sheds any light on defendant's knowledge or awareness of her mental condition and capacity to consent.

In order to establish effective consent by the putative victim of a sexual assault, a defendant must demonstrate the presence of "affirmative and freely-given permission. . . ." *In the Interest of M.T.S.*, 129 *N.J.* 422, 448, 609 *A.*2d 1266 (1992). The use of evidence of a victim's prior sexual encounters to establish consent based on such affirmative manifestations is prohibited. *Budis, supra*, 125 *N.J.* at 540, 593 *A.*2d 784 ("evidence of the victim's prior sexual abuse may not be used to support an inference that she 'consented' to the acts with defendant."); *accord State v. Green*, 163 *W.Va.* 681, 260 *S.E.*2d 257, 261 (1979) ("rape victim's previous sexual conduct with other persons has very little probative value about her consent to intercourse with a particular person at a particular time."). Prior sexual history may not be used as proof of the absence or withholding of consent. *Frost, supra*, 686 *A.*2d at 1178 (holding that fact that victim engaged in prior sexual activity is not probative of her legal capacity to consent). Additionally, even if prior sexual acts implicated the refusal to consent by the victim, that evidence would not be material or probative if too remote from the charged offense. *Ibid.* (noting that prior sexual acts involving refusal would be probative of capacity to refuse only on assumption of "reasonable proximity in time to the charged crimes.").

The dissent below believed that the "prior experiences and their effect on [T.O.] were relevant [ ] to the issue of defendant's perception of a mental limitation that might have counterindicated her capacity to refuse." 303 *N.J.Super.* at 613, 697 *A.*2d 550. Defendant cannot establish the reasonableness of his belief that the victim consented and was capable of consenting by attempting to show that other persons in the distant past may have believed that the victim had consented to their sexual advances. Ancient and ambiguous sexual acts of the victim, which cannot as such prove current consent, would have virtually no

bearing on whether or not the defendant would have reason to know of the victim's mental capacity to engage in sex. In fact, defendant did not know T.O. and had no knowledge of her prior experiences. Even if, unlike the situation here, a defendant is aware of the previous sexual behavior of the victim with others, such evidence is irrelevant because the defendant's generalized belief that the victim could consent to sexual relations is immaterial. *Anderson, supra,* 902 *P.*2d at 1208. "[T]he critical inquiry [is] whether defendant was aware of the victim's mental retardation.... [T]he victim's alleged reputation for promiscuous sexual activity is immaterial to that inquiry." *Ibid.*

In short, the trial court correctly concluded that two acts eleven years prior to the incident in question were not relevant to whether in 1992 defendant had or should have had knowledge about T.O.'s mental deficiency.

 Even assuming the relevance of T.O.'s prior sexual experience to either her capacity to consent or defendant's knowledge thereof, the probative value of that evidence next must be balanced with its prejudicial impact. *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784. Against any demonstration of probative value must be weighed the prejudice that inevitably resounds from the introduction of such evidence. "The Legislature, in enacting the rape-shield law, has said that in admitting evidence of the victim's prior sexual activity, there is prejudice *per se.*" *Id.* at 548, 593 *A.*2d 784 (O'Hern, J., dissenting). In addition, in balancing the probative value of the evidence, the confrontation clause does not compel the admission of evidence that will distract the jury, obscure the issues, and create undue confusion. *Id.* at 538, 593 *A.*2d 784.

Many courts that have considered challenges to the exclusion of evidence under rape shield statutes on confrontation grounds support the conclusion that, in a case such as this, the probative value of the evidence of prior sexual experience is slight and the exclusion of that evidence is appropriate. *See Ex parte Dennis v. State,* 730 *So.*2d 138, 143 (Ala.1999) (rejecting evidence that child victim may have had prior sexual encounter with person other

than defendant because it would not have established that prior sexual experience was responsible for recurrent penetration); *State v. Kennedy*, No. 95–0912, 1996 WL 255041, at *1 (Wis.App. 1996) *(per curiam)* (rejecting defendant's appeal for new trial based on newly-discovered evidence of prior sexual abuse in part because minimal probative value of evidence was outweighed by its prejudicial effect); *Shaw, supra*, 892 *F.Supp.* at 1275–78 (rejecting defendant's post-conviction challenge to exclusion of evidence of victim's past sexual behavior to negate inference that her sexual knowledge was based on recent experiences because evidence, although relevant, would unduly prejudice jury); *United States v. Acevedo*, No. 91–C–1352, 1992 WL 71797, at *17 (N.D.Ill. April 1, 1992) (denying defendant's petition for habeas corpus because trial court acted properly in applying rape shield statute to preclude evidence concerning victim's prior and subsequent sexual activity with others because its probative value was slight), *aff'd*, 996 *F.*2d 145 (7th Cir.), *cert. denied*, 510 *U.S.* 916, 114 *S.Ct.* 307, 126 *L.Ed.*2d 255 (1993). Even accounting for the fact that the prejudice to the victim is reduced by introducing the testimony through an expert, and not through the victim herself, thereby lessening her personal embarrassment, *cf. Tague v. Richards*, 3 *F.*3d 1133, 1138 (7th Cir.1993) (observing in case in which evidence of prior uncharged sexual molestation was admissible because critical issue was source of hymenal damage to eleven-year old girl, prejudice from use of such evidence could be reduced by avoiding direct testimony by victim), the prejudice here is not outweighed by the scant probative value of the evidence.

The dissent suggests here that because there are only two prior incidents in T.O.'s history, they do not demonstrate "promiscuity" and, therefore, she ought not to be embarrassed if they are introduced into evidence. *Post* at 608–09, 733 *A.*2d at 427–28. That observation, perhaps unintendedly insensitive, does not account for the victim's own feelings, which indicate that she felt discomfort and personal guilt over her previous sexual experiences. *See supra* at 593–94 n. 3, 733 *A.*2d at 419 n. 3. The unjust

aspersion of promiscuity is not the only reason that renders personal sexual history a matter of privacy for the victim.

The dissent makes a fair observation in pointing out that ordinarily an expert should be subject to cross-examination concerning the basis for his or her opinion. *Post* at 614, 733 *A*.2d at 431. *See N.J.R.E.* 705. Like most rules of evidence, however, *N.J.R.E.* 705 has limitations. *See, e.g., Scherzer, supra,* 301 *N.J.Super.* at 415, 694 *A*.2d 196 (noting that scope of cross-examination in respect of facts underlying expert's report that victim was mentally defective was "within the trial court's discretion" and should not be interfered with "unless clear error and prejudice are shown"). In this case, where the underlying evidence has little probative value; where that evidence was given only marginal weight by the expert; where the prejudice to the victim from that evidence is clear and inescapable; and further, where the defendant has had a full opportunity otherwise to present his defenses relating to his unawareness of the victim's mental capacity, it would be an abuse of discretion to permit the cross-examination to delve into T.O.'s sparse, vague and remote sexual experiences.

To allow the exposure and exploitation of this victim's past sexual history merely because the door of cross-examination was opened slightly would unfairly deny her the protections of the Rape Shield Law. That statute, as earlier noted, was designed to protect the privacy and dignity of the victims of sexual crimes. *Ante* at 597, 733 *A*.2d at 421. Before the law, "rape trials sometimes denigrated to embarrassing invasions of the victim's privacy" because of the frequent " 'character assassination' of the victim[.]" *Budis, supra,* 125 *N.J.* at 529, 593 *A*.2d 784 (citation omitted). The protections of the Rape Shield Law should be heightened in respect of victims who are particularly vulnerable to these kinds of character attacks. *Cf. State v. Besk,* 138 *N.H.* 412, 640 *A*.2d 775, 776 (1994)(rejecting view that "the protection now afforded to rape victims against exposure of their sexual histories [should] apply only to adults and adolescents, and not to the

youngest, most vulnerable victims of all—prepubescent children" because "[s]uch a construction of the rape shield law would run contrary to the legislature's intent 'to protect the victims of rape from ... procedures that only serve to exacerbate the trauma of the rape itself.' "). Such victims include not only persons who are young or immature, or emotionally disturbed, or socially disadvantaged, but also victims who are mentally challenged. That victim should not have to forfeit the protections of the Rape Shield Law because an expert must explain her mental condition and her defenselessness, particularly when her sexual history has comparatively inconsequential probative value.

In addition, the admission of the proffered evidence would have engendered extensive jury confusion. Evidence of remote sexual experiences that occurred under circumstances that are vaguely presented and not comparable to those surrounding the currently charged offense have an extreme potential for confusion. *E.g. Dennis, supra,* 730 *So.*2d at 143 (upholding trial court's determination that admission of evidence of victim's sexual history would have tendency to confuse jury); *Kennedy, supra,* 1996 WL 255041 at *1 (stating that "[b]ecause of the minimum probative value of [ ] evidence [of prior sexual experiences], its admission would serve only to confuse the jury rather than clarify the issues"); *Shaw, supra,* 892 *F.Supp.* at 1274 (holding that evidence of victim's past sexual experiences would confuse issues to be tried); *Acevedo, supra,* 1992 WL 71797 at *17 (precluding evidence of victim's prior and subsequent sexual activity with others because "its potential to confuse and distract the jury was substantial").

Here, the circumstances of the previous encounters were very different: they involved acquaintances of T.O., as opposed to pure strangers; they occurred when T.O. was much younger and still in school; and the motivation and intent of the participants were influenced by their previous relationships. The collateral inquiry into those incidents in a convoluted attempt to extrapolate the victim's current capacity to consent would likely have been distorted, discursive, incomplete and speculative. Evidence of those

incidents, therefore, would have easily mislead and distracted the jury and could not reliably shed meaningful light on the issue of whether the victim, wishing to withhold consent to defendant's sexual advances, had the capacity to do so.

## IV

 In conclusion, only in situations where the relevance and probative worth of prior sexual experience are clear and substantial should the Rape Shield Law bend to the confrontation rights of the defendant. That is not the case here. Further, any probative value in admitting evidence of T.O.'s past sexual experience is clearly outweighed by its prejudicial effect and capacity to confuse.

For the reasons stated, the judgment of the Appellate Division is affirmed.

STEIN, J., dissenting.

New Jersey's Rape Shield Law, *N.J.S.A.* 2C:14-7, was enacted primarily to protect sexual assault victims from cross-examination concerning prior sexual conduct that was intended to depict the victim as lacking in moral character and therefore likely to have consented to sexual activity with the accused. *State v. Budis,* 125 *N.J.* 519, 528-29, 593 *A.*2d 784 (1991). In this appeal, defendant, an Albanian refugee with minimal skills in the English language, was convicted of sexual assault despite his contention that his sexual contact with the victim was consensual. Defendant's sexual assault convictions were substantially predicated on the testimony of the State's expert psychologist who concluded that the victim, age thirty, lacked capacity to consent. In reaching that conclusion, the State's expert relied in part on the victim's accounts *of her only two prior sexual encounters* that had occurred approximately ten years earlier. Despite their obvious relevance, the trial court barred defense counsel from cross-examining the expert about his reliance on those two sexual encounters, mistakenly assuming that the vital interests protected by the Rape Shield

Law would be compromised. In my view, the trial court's application of the Rape Shield Law was erroneous because defense counsel's proposed cross-examination of the State's expert was not intended to suggest that the victim was promiscuous or to impugn her morality. To the contrary, her minimal sexual experience was undisputed. The cross-examination was intended only to challenge the expert's conclusion that the victim lacked the mental capacity to consent, the pivotal issue in the case. Nevertheless, the Court now sustains defendant's convictions for sexual assault.

I would reverse defendant's sexual assault convictions substantially for the reasons set forth in the dissent below. *State v. Cuni,* 303 *N.J.Super.* 584, 611–13, 697 *A.2d* 550 (1997) (Pressler, J., dissenting). These supplemental observations address in greater detail my view of the Court's severe application of the Rape Shield Law to sustain the lower court's ruling, a ruling that prevented defense counsel from adequately cross-examining the State's psychiatrist and thereby deprived defendant of his constitutional right of confrontation, *U.S. Const.* amend. VI; *N.J. Const.* art. 1, para. 10, which encompasses the right to cross-examine the State's witnesses. *Budis, supra,* 125 *N.J.* at 530–32, 593 *A.2d* 784.

I

Defendant, an Albanian refugee unskilled in English, described in the Adult Diagnostic and Treatment Center's report as "mentally deficient," and with an English vocabulary score at less than the first percentile, defended the sexual assault charges against him on the basis that he believed the victim, T.O., willingly participated in an act of sexual intercourse. The State's psychologist, Dr. Anthony D'Urso, testified on direct examination that the thirty-year-old victim's mental retardation rendered her incapable of exercising the right to refuse sexual relations, notwithstanding that he observed her to be knowledgeable about sexual activity.

As the Appellate Division noted, however, Dr. D'Urso admitted that T.O.'s ability to express herself exceeded her mental condition. He said that based on the way she communicated with other

people, "she comes across as having a higher level of ability than her test score would support." He conceded that her "language skills belie the fact that she's mentally retarded." 303 *N.J.Super.* at 605, 697 *A*.2d 550. Defendant's expert agreed with that assessment:

Q. What did you find her verbal skills to be?

A. [T.O.] was very fluent, very spontaneous[,] spoke[ ] in complete sentences. She was engaging—she had a sense of humor. She responded fully and openly to everything I asked her. She appeared very relaxed. She came across as more verbal than the scores would have led me to believe. If I only had her scores, in other words, and didn't see her I would have expected less verbal [ ]ability than I actually saw. She conversed very fluently.

The confrontation issue concerned the victim's only two prior sexual experiences, both occurring about ten years prior to the incident at issue, which she had described to Dr. D'Urso and about which he testified *in camera* at trial. *Ante* at 592–95, 733 *A*.2d at 418–20.

Defense counsel attempted to cross-examine Dr. D'Urso concerning those incidents. Unquestionably, the purpose and intended scope of that cross-examination did not infringe on the important interests protected by the Rape Shield Law: the victim's limited sexual activity (two prior experiences in thirty years) obviated any attempt to establish consent based on promiscuity, nor was the cross-examination of Dr. D'Urso calculated to embarrass the victim or invade her privacy. See *Budis, supra*, 125 *N.J.* at 528–30, 593 *A*.2d 784. Its sole purpose was to permit defense counsel to challenge Dr. D'Urso's testimony—indispensable to the State's case—that the victim lacked the capacity to consent. Notwithstanding the Court's conclusion that the evidence lacked relevancy or could confuse the jury, *ante* at 601–03, 604–05, 733 *A*.2d at 423–25, 425–26, the victim's description to the State's expert of the circumstances surrounding her *only two* prior sexual encounters provided defense counsel with the most realistic opportunity during the entire trial to challenge the State's expert's conclusion that the victim could not consent to sexual activity.

The Court attempts to justify preclusion of the cross-examination of Dr. D'Urso partially on the basis of defense counsel's failure to apply "before the trial or preliminary hearing" to the trial court for an order to permit admission of evidence of the victim's prior sexual conduct. *N.J.S.A.* 2C:14–7(a). The Court concludes that the remedy for noncompliance with that statutory requirement is preclusion, *ante* at 598–99, 733 *A.*2d at 422, noting that the only exception to the statute's procedural mandate is for "newly discovered [evidence that] could not have been obtained earlier through the exercise of due diligence." *Ante* at 597, 733 *A.*2d at 421 (alteration in original). Nevertheless, citing *Michigan v. Lucas,* 500 *U.S.* 145, 153, 111 *S.Ct.* 1743, 1748, 114 *L. Ed.*2d 205, 214–15 (1991), the Court acknowledges that the Rape Shield Law must be construed to permit a trial court to waive the procedural bar if in a given case preclusion would violate a defendant's constitutional right of confrontation. *Ante* at 598, 733 *A.*2d at 422. The Court concludes, however, that preclusion was the appropriate remedy for the procedural violation because introduction of that evidence in mid-trial without prior notice "blindsided the State." *Ante* at 599, 733 *A.*2d at 422.

I suggest that the Court's characterization is excessive, because the critical issue throughout the trial was the victim's capacity to consent to intercourse. In view of Dr. D'Urso's report and testimony that the victim lacked capacity to refuse, that report's reference to the victim's two prior sexual experiences was an obvious target of defense counsel's cross-examination, and was no less obvious because of defense counsel's procedural slip. The correctness of the remedy of preclusion cannot stand or fall on the basis of the statute's procedural requirement, but ultimately must be determined on the basis of defendant's constitutional right of confrontation. See *Michigan v. Lucas, supra,* 500 *U.S.* at 153, 111 *S.Ct.* at 1748, 114 *L.Ed.*2d at 215 ("We leave it to the Michigan courts to address in the first instance whether Michigan's rape-shield statute authorizes preclusion and whether, on the facts of

this case, preclusion violated Lucas' rights under the Sixth Amendment.").

In *Budis, supra,* we indicated that the reconciliation of the interests protected by the Rape Shield Law with those advanced by the constitutional right of confrontation depended on a balancing of the prejudicial effect and the probative value of the challenged evidence. We noted that

> [t]he Rape Shield Statute directs trial courts to consider whether evidence of prior sexual conduct will "create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *N.J.S.A.* 2C:14-7. Similarly, the confrontation clause does not compel the admission of evidence that will prejudice the victim, jeopardize her safety, or confuse the jury.
>
> [*Budis, supra,* 125 *N.J.* at 538, 593 *A.*2d 784.]

The significant interests protected by the Rape Shield Law are material to any fair assessment of whether substantial prejudice to the victim would result from any of defense counsel's proposed cross-examination of Dr. D'Urso. The salutary purpose of the statute is to protect a rape victim from any interrogation about her prior sexual experiences when that interrogation is intended to suggest that her sexual contact with the accused was probably consensual:

> Before revisions to rape shield laws were made, a victim's past sexual history was admissible in evidence to impeach her credibility or to show, based on these past sexual acts, that it was probable that she consented to the act. It was society's assumption that a woman who had consented to sex in the past more than likely consented to sex during this act. As a result of these unwarranted and overly simplistic assumptions, reformers sought to enact rape shield laws to protect the victim from this scrutiny.
>
> [Shacara Boone, *New Jersey Rape Shield Legislation: From Past to Present— The Pros and Cons,* 17 *Women's Rts. L. Rep.* 223, 224 (1996) (footnotes omitted).]

We expressed similar observations about our rape-shield statute in *Budis:*

> Those laws represent a legislative response to the common law rule permitting cross-examination of a rape victim about her prior sexual conduct. Such conduct was traditionally considered evidence of the victim's inclination to consent to sexual intercourse and of her lack of moral character and credibility. Because of the "character assassination" of the victim, rape trials sometimes degenerated to embarrassing invasions of the victim's privacy.

One of the primary purposes of the statutes is to protect rape victims from excessive cross-examination, thereby encouraging them to report the abuse. The statutes also guard against the improper use of evidence of the victim's prior sexual experience. Thus, in addition to protecting victims of sexual assault, rape-shield statutes preserve the integrity of trials. By ensuring that juries will not base their verdicts on prejudice against the victim, the statutes enhance the reliability of the criminal justice system.

[*Budis, supra,* 125 *N.J.* at 528–29, 593 *A.2d* 784 (citations omitted).]

Fairly read, this record demonstrates that none of the interests underlying the enactment of the Rape Shield Law were significantly implicated by defense counsel's proposed cross-examination of Dr. D'Urso. The interest in "protect[ing] rape victims from excessive cross-examination," *Budis, supra,* 125 *N.J.* at 529, 593 *A.2d* 784, is not implicated because defense counsel intended only to cross-examine Dr. D'Urso. See *Tague v. Richards,* 3 *F.*3d 1133, 1139 (7th Cir.1993) ("The degree to which A.T. would have been forced to relive this offensive conduct was ameliorated by the fact that she was not the witness being questioned regarding the incident."). The interest in protecting a victim from an accused's attempt to prove her lack of moral character and inclination to consent on the basis of prior sexual conduct is simply not compromised by the proposed cross-examination. The victim's only prior sexual experiences occurred ten years ago. If anything, they demonstrated the victim's lack of interest in sexual contact and established not that she was promiscuous but that her sexual experience was minimal. The question to be pursued by the proposed cross-examination did not concern the victim's inclination to consent, but rather her mental capacity to consent. The protections that the Rape Shield Law were intended to provide simply were not implicated by the proposed cross-examination.

The Court insists that the Rape Shield Law "was designed to protect the privacy and dignity of the victims of sexual crimes," *ante* at 606, 733 *A.2d* at 426, a "victim[ ] who [is] mentally challenged . . . should not have to forfeit the protections of the Rape Shield Law because an expert must explain her mental condition." *Ante* at 607, 733 *A.2d* at 426. The Court's rhetoric obscures the issue. No one disputes that vulnerable victims are

equally deserving of the protections of the Rape Shield Law. But those protections were designed to shield victims from cross-examination about prior sexual experiences designed to show *inclination* to consent—not capacity to consent. The "capacity" issue dominated this trial because the State offered no evidence of force or coercion. The proposed cross-examination was not intended to embarrass the victim or invade her privacy, *and the victim was not the witness to be cross-examined.* Rather, the object of the cross-examination was the State's expert, who offered the crucial opinion concerning T.O.'s capacity to consent to sexual activity, and who relied on her prior experiences in formulating that opinion. Surely, the victim's privacy interest in avoiding that cross-examination is limited and attenuated.

Because the prejudice to the victim from the proposed cross-examination was minimal, the probative value of the proposed cross-examination need not be overwhelming to sustain defendant's constitutional right to adduce that testimony. The Court, however, misperceives the purpose of the expert's cross-examination, observing that "[t]here is no indication that T.O. was not a willing participant in either [prior] sexual encounter.... These prior incidents, therefore, do not tend to prove that T.O. had the ability to exercise consent." *Ante* at 602, 733 *A.*2d at 424.

Taking into account the context in which the issue of relevance arose, the Court's conclusion is flawed. The prior incidents, in isolation, may not demonstrate T.O.'s present capacity to consent to sexual activity. Their relevance, however, derives from the fact that the State's only expert witness relied on T.O.'s *current* account of those incidents in reaching his conclusion that she lacked the capacity to withhold consent. Both the State's and defendant's psychological experts conducted examinations of the victim in order to assess her capacity to consent to sexual activity. Both experts questioned the victim about her two prior sexual experiences, but their respective accounts of her description of

those events differed sharply. The Court's opinion includes portions of the reports of both experts, and defendant's expert's account fairly can be characterized as describing the victim as a voluntary participant in both encounters, in marked contrast to the account contained in the State's expert's report. *Ante* at 593–94 n. 3, 733 *A*.2d at 419 n. 3. Dr. D'Urso's report clearly indicated that he took into account the victim's report of her prior sexual experiences in determining that she lacked the capacity to withhold consent. When questioned by the trial court *in camera* about whether he relied on her description of her two prior sexual experiences to reach a conclusion about her capacity to consent, Dr. D'Urso replied:

> [T]he answer is yes. What weight it had, probably no more important or less important than any other example of how she deals with stress in her life. *But it's one piece that this does have that nothing else has is obviously her knowledge of sexuality.*

Accordingly, contrary to the Court's implication, the focus of the proposed cross-examination was not on whether T.O.'s prior sexual experiences were consensual, but rather on the soundness of the conclusion reached by Dr. D'Urso in reliance on those experiences. Defense counsel also stressed the unique significance of the evidence relating to the victim's only two prior sexual experiences in the course of *in camera* argument to the trial court:

> I submit, Your Honor, that the State's case is almost entirely if not entirely predicated upon a psychological finding of defectiveness under the [C]ode. That's the whole State's case, Judge. There's no other evidence that I think would sustain a conviction in this case. If I am not allowed to examine the doctor on the factors that made up his opinion, his diagnosis as it will then, Judge, I'm [e]ffectively barred from cross-examining or from attacking that conclusion. What Your Honor is going to be saying to me is that you can ask him everything but perhaps the most important aspect of this particular case whether this girl has, could, would be able to consent to a sexual act or would be able to resist or repel that sexual act.

In *State v. Olivio*, 123 *N.J.* 550, 564, 589 *A*.2d 597 (1991), this Court held that for purposes of prosecutions under *N.J.S.A.* 2C:14–2c(2) a person is mentally defective "if, at the time of the sexual activity, the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or

incapable of understanding or exercising the right to refuse to engage in such conduct with another." We also held that the statute "imposes criminal liability only if the defendant 'knew or should have known' that the complainant was mentally defective." *Id.* at 568, 589 *A.*2d 597. Accordingly, Dr. D'Urso's opinion that the victim was incapable of exercising the right to consent or to refuse to engage in sexual activity was crucial to the State's case, and obviously was a primary factor in the jury's decision to convict defendant. Moreover, the expert's assurance—or lack of assurance—about the correctness of his conclusion obviously would bear on the jury's consideration of whether defendant knew or should have known that the victim's capacity to consent may have been impaired. Because defendant's English language skills were minimal, the strength or vulnerability of the expert's conclusions about the victim could have been the decisive factor in the jury's determination of defendant's culpability. Accordingly, an intense and comprehensive cross-examination of Dr. D'Urso was essential to the defense case.

That an expert ordinarily is subject to cross-examination concerning the facts underlying his opinion is incontrovertible. *See N.J.R.E.* 705 ("The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. *The expert may in any event be required to disclose the underlying facts or data on cross-examination.*") (emphasis added); *see also State v. Martini,* 131 *N.J.* 176, 264, 619 *A.*2d 1208 (1993) (" '[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion.' To determine the credibility, weight and probative value of an expert's opinion, one must question the facts and reasoning on which it is based.") (quoting *Glenpointe Assoc. v. Township of Teaneck,* 241 *N.J.Super.* 37, 54, 574 *A.*2d 459 (App.Div.), *certif. denied,* 122 *N.J.* 391, 585 *A.*2d 392 (1990)); *State v. Clowney,* 299 *N.J.Super.* 1, 19, 690 *A.*2d 612 (App.Div.) ("Thus, by its very premise for admissibility, its esoteric, abstruse, and especial nature, expert testimony and opinion are subjects for legitimately expansive cross-examination if a jury is to be enabled

to assess their soundness."), *certif. denied,* 151 *N.J.* 77, 697 *A.*2d 549 (1997).

The trial court not only barred defense counsel from cross-examining Dr. D'Urso about his reliance on the victim's prior sexual experiences, but it also precluded defense counsel from questioning defendant's own psychological expert on the extent to which his opinion about the victim's ability to engage in consensual sexual activity was influenced by her own description to him of her two prior sexual encounters.

## II

On that issue most critical to a determination of defendant's guilt or innocence of sexual assault—the victim's capacity to consent—cross-examination of the State's sole expert witness testifying on that issue could not constitutionally be restricted unless the interests protected by the Rape Shield Law were at risk. In fact, those interests were implicated only remotely by the proposed cross-examination. The potential probative value of that cross-examination, given the sharply contradicting evidence concerning the victim's capacity to consent, overshadowed any possible prejudicial effect. The vital interests underlying the Rape Shield Law are subverted if they are misapplied and misused to deny defendants a full and fair trial.

Applying the standard we espoused in *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784, I would hold that the probative value of the proffered cross-examination of Dr. D'Urso far outweighed any conceivable prejudice to the victim, and that the trial court's ruling that precluded such cross-examination constituted prejudicial and reversible error. Accordingly, I would reverse defendant's sexual assault convictions.

Chief Justice PORITZ and Justice COLEMAN join in this opinion.

*For affirmance*—Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—4.

*For reversal*—Chief Justice PORITZ and Justices STEIN and COLEMAN—3.